STATE of Missouri, Respondent,

v.

Charles Ervon MAHAN, Jr., Appellant.

STATE of Missouri, Respondent,

v.

Sean L. SYKES, Appellant.

Nos. 80128, 80268.

Supreme Court of Missouri,
En Banc.

June 16, 1998.

Rebecca L. Kurz, Asst. Public Defender, for Appellant in cause No. 80128.

Ellen H. Flottman, Craig A. Johnston, Asst. Public Defenders, Columbia, for Appellant in cause No. 80268.

Jeremiah W. (Jay) Nixon, Atty. Gen., Joanne E. Joiner, Asst. Atty. Gen., Jefferson City, for Respondent in cause Nos. 80128 & 80268.

PRICE, Judge.

Section 191.677, RSMo 1994, creates the class D felony of creating a grave and unjustifiable risk of infecting another with HIV. Specifically, section 191.677.1.(2), RSMo 1994 [1] provides:

> It shall be unlawful for any individual knowingly infected with HIV to ... deliberately create a grave and unjustifiable risk of infecting another with HIV through sexual or other contact when an individual knows that he is creating that risk.

Sean Sykes was charged with two counts and Charles Mahan was charged with one count under the statute. Juries in separate trials convicted both men. Both claim on appeal that section 191.677 is unconstitutionally broad. Mahan makes the additional claim that the statute is void for vagueness. We have exclusive jurisdiction. Mo. Const. art. V, sec. 3. The judgments of the circuit courts are affirmed.

## I.

HIV is the human immunodeficiency virus that causes acquired immunodeficiency syndrome (AIDS). Section 191.650(5), RSMo 1994. AIDS is a viral disease that weakens and then destroys the body's immune system, which leads to death. *State ex rel. Callahan v. Kinder*, 879 S.W.2d 677, 679 (Mo.App.1994) (*citing Doe v. Barrington*, 729 F.Supp. 376, 380 (D.N.J.1990)). HIV is acquired through contact with the blood, semen or vaginal fluid of an infected person. *Id.* It is most commonly passed through sexual intercourse and the sharing of intravenous needles, although there are other means of exposure to the virus.

### A.

On May 14, 1992,[2] Sykes received his first session of "level II counseling." Level II counseling is administered to an HIV-positive individual by a public health counselor when officials receive reports that the individual may be exposing people to the virus.[3] Kevin Wells, a public health counselor with the Kansas City Health Department, conducted the session.

At this session, Wells first asked Sykes to explain how HIV is transmitted. Wells testified that Sykes "remember[ed] the modes of transmission from the first interview that he had before mine." Wells then explained to the jury that:

> Since this is a level II intervention and there was further need for counseling, we talk to them about a need for behavior modification.... We discuss why there was a further need for counseling and ways that we could eradicate this so modes of transmission won't happen so no one else can get infected with the disease.

---

1. The legislature removed the words "grave and unjustifiable risk" from the statute in 1997. The pertinent provision of section 191.677 now reads:

   It shall be unlawful for any individual knowingly infected with HIV to

   * * *

   (2) Act in a reckless manner by exposing another person to HIV without the knowledge and consent of that person to be exposed to HIV, through contact with blood, semen or vaginal fluid in the course of oral, anal or vaginal sexual intercourse, or by the sharing of needles.

2. According to the record, Sean Sykes was tested for HIV three times. The first test is dated September 28, 1992. The following two are dated January 15, 1993 and August 12, 1993. It is not clear from the record why the earliest recorded HIV test post-dates Sykes' first "level II" counseling session.

3. People who have tested positive for HIV may receive three types of intervention from public health officials. Level I counseling takes place after the initial positive test. Level II counseling occurs if public health officials receive a report that the HIV-positive individual may be exposing someone to the virus. At each level, HIV-positive individuals are informed of the types of behavior that may expose others to the virus. A Level III intervention refers an HIV-positive individual for prosecution under section 191.677.

Wells testified that Sykes "knew that he needed to notify his sex partners" that he was HIV-positive. Wells also testified and he and Sykes "talk[ed] about the use of condoms, that it was mandatory during sex. One, you notify your sex partners you are HIV-positive; two you do use condoms." Nevertheless, Sykes told Wells that he did not like wearing them. Wells went over the proper technique for applying and using a condom with Sykes after Sykes told Wells that condoms seemed to break when he wore them.

Wells also testified that he read section 191.677 to Sykes and that he had Sykes repeat the law back to him. Sykes also signed a form in which he stated that he was aware of what Missouri law entailed and that he would not violate the law.[4] In this form, Sykes acknowledged as well that he was HIV-positive and that he had received level II counseling that day from Kevin Wells.

Before they parted, Wells gave Sykes a pamphlet that stated:

> Criminal charges could be filed against you if you know you carry the AIDS virus and you create a risk of infecting another person with the virus through sex, needle sharing, or other established means of transmitting the virus.... It is your responsibility to alter your behavior so that you do not expose other people to the AIDS virus.

About eight months later, Wells learned that Sykes was in need of another level II counseling session. They met on January 15, 1993. Once again they went over the modes of transmission and the need for Sykes to use condoms and to tell his partners that he was HIV-positive. Sykes told Wells that "he couldn't use condoms because they would break on him and that his penis was too large." Wells told Sykes that a properly cared-for and applied condom would fit over any sized penis. He demonstrated this by stretching a condom over his fist. Before they parted, Sykes signed another form acknowledging his HIV status and promising to abide by the law.

Wells testified that at this second meeting, Sykes' attitude was "nonchalant." Wells stated that "[Sykes] knew about the disease and yet it seemed like I was being a nuisance coming there to discuss the disease with him because he didn't want anyone to know about his status by having a public health official there."

About a year and a half after this encounter, Sykes met Jamie Walker, who was sixteen years old. Sykes and Walker had sex four times between October of 1994 and September of 1995. Sykes never told her that he was HIV-positive. Before their first sexual encounter, Walker asked Sykes whether he had a condom. He told her that he did not. Walker testified that she never mentioned the subject of condoms after that. To date, Walker has not tested HIV-positive.

In October of 1995, two and a half years after his last level II intervention, Sykes met nineteen-year-old Jana Brent. By Thanksgiving, Brent had moved in with Sykes and they began a sexual relationship. Brent testified that they had sex three to four times a week between November of 1995 and April of 1996, the time period in which they lived together. Brent testified that Sykes never told her that he was HIV-positive. She also stated that while they sometimes used a condom when having sex, "more often than not" they did not. Brent discovered that she had contracted HIV in the summer of 1996.

## B.

Charles Mahan tested positive for HIV in June of 1990. Shirley Wells, an official with the Joplin City Health Department and the Missouri Department of Health, conducted a level II counseling session with Mahan on July 23, 1992. Wells testified that her method of counseling was to "engage the individual in discussion and on occasion have them critique what I've said in their own words so that I can be sure that they do understand the mode of transmission [and] Missouri laws ..." Using this method of counseling, Wells and Mahan "discussed in detail" how HIV is

---

4. The trial transcript reveals that both of the level II forms that Sykes signed, as well as the one that Charles Mahan signed, were entered into evidence at trial. Inexplicably, the state failed to supplement the record on appeal with these forms.

transmitted to others. Wells stated that Mahan "fully understood the modes of transmission."

Wells also emphasized that to minimize the risk of infection, Mahan should notify sexual partners of his HIV-positive status and should use condoms when engaging in sexual acts. Wells demonstrated proper condom usage and discussed with Mahan alternative sexual behaviors that did not subject others to the risk of infection. Wells also testified that she read section 191.677 to Mahan, gave him a copy of the statute, and asked him whether he had any questions regarding Missouri law. At the end of their session, Mahan signed a verification form in which he acknowledged that he was HIV positive and that he had undergone level II counseling that day with Wells.

That same month, Mahan met Bruce Stuebner. Stuebner and Mahan had anal sex ten to twenty times over the course of the following eleven months without ever using a condom. Before they had engaged in any sexual acts, Stuebner asked Mahan if he was HIV-positive. Mahan responded that he was not. Stuebner contacted authorities after he learned in July of 1995 that he had contracted HIV.

### C.

An information charged Sean Sykes with two counts of creating a grave and unjustifiable risk of HIV infection under section 191.677, RSMo. A jury convicted him and recommended a sentence of five years imprisonment for each count. The trial court sentenced him to two consecutive five-year terms of imprisonment.

Charles Mahan was charged by indictment with one count of creating a grave and unjustifiable risk of HIV infection under section 191.677, RSMo. A jury found him guilty as well and recommended a five-year prison term. The trial court sentenced him to five years imprisonment.

Both Sykes and Mahan appeal from their convictions and sentences. They allege that their respective trial courts erred in overruling their motions to dismiss on grounds of unconstitutionality and in submitting the charges to the jury over their objections. We have combined the appeals owing to the similarity of their arguments.

### II.

#### A.

■ Sykes and Mahan each raise a facial overbreadth challenge to section 191.677.1.(2). Appellants argue that the statute is unconstitutionally overbroad because it criminalizes certain conduct that they claim is constitutionally protected. Appellants include in this category heterosexual intercourse between an HIV-positive individual and a willing and informed partner and childbirth by an HIV-positive mother.[5]

■ Sykes and Mahan concede that their actions do not fall into any constitutionally protected category. It is a fundamental rule of constitutional adjudication that "a person to whom a statute may be constitutionally applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others." *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *see also R.J.J. by Johnson v. Shineman,* 658 S.W.2d 910, 914 (Mo.App.1983).

■ The United States Supreme Court has recognized some exceptions to this principle. "One such exception is where individuals not parties to a particular suit stand to lose by its outcome and yet have no effective

---

5. In *Eisenstadt v. Baird,* the United States Supreme Court stated that "if the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." 405 U.S. 438, 454, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). Noting that *Eisenstadt* dealt solely with contraception, the Court in *Bowers v. Hardwick* expressly found that the right to privacy did not insulate "private sexual conduct between consenting adults." 478 U.S. 186, 190–91, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986). Whether these cases confer constitutional protection on sexual intercourse between an HIV-positive individual and a willing and informed partner is not clear. Because appellants lack standing, we do not address it at this time.

avenue of preserving their rights themselves." *Broadrick*, 413 U.S. at 612, 93 S.Ct. 2908 (citing *Eisenstadt v. Baird*, 405 U.S. 438, 444–46, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972)). "Another exception has been carved out in the area of the First Amendment." *Id.; State v. Madsen*, 772 S.W.2d 656, 659 (Mo. banc 1989).

Mahan alleges that he has standing under *Eisenstadt* to raise the claims of others to whom the statute could not be applied constitutionally. Mahan's analogy to *Eisenstadt*, however, is unwarranted. Here, nothing would bar an HIV-positive person who has sex with a knowing and consenting partner or an HIV-positive woman who gives birth from raising such a constitutional defense if they were prosecuted under this statute.

■ Neither appellant raises a direct First Amendment claim. Mahan observes that the right to privacy recognized in *Griswold v. Connecticut*, 381 U.S. 479, 482–486, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), emanates from penumbras surrounding the First, Third, Fourth, Fifth and Ninth Amendments. This observation is insufficient to establish standing under the First Amendment. First Amendment facial overbreadth challenges are clearly concerned with the rights of free speech and expression. *See, State ex rel. Cook v. Saynes*, 713 S.W.2d 258, 261 (Mo. banc 1986); *see also Broadrick v. Oklahoma*, 413 U.S. at 612, 93 S.Ct. 2908. Mahan does not demonstrate how section 191.677 prohibits or chills any activity protected by the First Amendment.

We find that neither Sykes nor Mahan has standing to bring a claim of unconstitutional overbreadth. This point is denied.

### B.

■ Mahan also challenges the constitutionality of section 191.677 on the grounds of vagueness. An enactment is void for vagueness under the Due Process clause if its prohibitions are not clearly defined. *Grayned v. City of Rockford*, 408 U.S. 104, 109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). The prohibition against vagueness ensures that laws give fair and adequate notice of proscribed conduct. In addition, the void-for-vagueness doctrine protects against arbitrary and discriminatory enforcement. *State ex rel. Cook v. Saynes*, 713 S.W.2d 258, 260 (Mo. banc 1986). A valid statute provides a person of ordinary intelligence a reasonable opportunity to learn what is prohibited. *State v. Mahurin*, 799 S.W.2d 840, 842 (Mo. banc 1990).

Mahan alleges that the phrase "grave and unjustifiable risk" does not give fair notice of prohibited conduct and does not provide standards to enforcement officers to prevent arbitrary and discriminatory enforcement. Specifically, Mahan charges that because the risk of passing HIV through sexual intercourse is quantitatively unknown to scientists, a person of "ordinary intelligence" has no way of knowing when the riskiness of his or her conduct rises to the level of "grave and unjustifiable."

■ It may be possible to hypothesize conduct that would not clearly fall either in or out of the statutory prohibition on creating a "grave and unjustifiable" risk of HIV infection. Nevertheless, on a challenge that a statute is unconstitutionally vague, "it is not necessary to determine if a situation could be imagined in which the language used might be vague or confusing." Rather, the language is to be evaluated by "applying it to the facts at hand." *State v. Young*, 695 S.W.2d 882, 883–84 (Mo. banc 1985).

Mahan engaged in ten to twenty acts of unprotected, "unsafe" sex after Shirley Wells explained to him that having sex without a condom put others at risk for exposure to HIV and was against the law. The sex acts in which Mahan took part involved anal intercourse, which Wells had described to Mahan as one of the most risky types of sexual behavior. Mahan signed a verification form in which he acknowledged that he was HIV-positive and in which he confirmed that he understood that Missouri law prohibited acts that would put others at risk for exposure. Mahan lied to Bruce Stuebner after Stuebner expressly asked Mahan if he was HIV-positive.

These facts leave no doubt that Mahan subjected Bruce Stuebner to a "grave and unjustifiable risk" of exposure to HIV. This point is denied.

## III.

■ Sykes and Mahan also both allege that the trial courts erred in permitting the prosecution to present evidence to the jury that they were HIV-positive. Appellants argue that by subpoenaing and subsequently revealing their HIV test results to the jury, the prosecutors violated their medical privilege under section 191.656, RSMo.

Section 191.656 provides:

1. (1) All information known to, and records containing any information held or maintained by, any person, or by any agency, department, or political subdivision of the state concerning an individual's HIV infection status or the results of any individual's HIV testing shall be strictly confidential and shall not be disclosed except to:

(a) Public employees within the agency, department, or political subdivision who need to know to perform their public duties;

(b) Public employees of other agencies, departments, or political subdivisions who need to know to perform their public duties;

(c) Persons other than public employees who are entrusted with the regular care of those under the care and custody of a state agency, including but not limited to operators of day care facilities, group homes, residential care facilities and adoptive or foster parents;

(d) As authorized by subsection 2 of this section.[6]

Appellants argue that the statute's directive that HIV test results be kept strictly confidential is "plain and clear." *See State ex rel. Callahan v. Kinder*, 879 S.W.2d 677, 680 (Mo.App.1994). They contend that none

of the exceptions listed in the statute applies to a prosecutor seeking to enforce the criminal prohibition against risking infection with HIV.

Appellants overlook subdivision (1)(b) of section 191.656.1. Subdivision (1)(b) permits the results of any individual's HIV test to be disclosed to public employees outside of the department of health who need to know the individual's status in order to "perform their public duties." Because infection with HIV is an element of the crime of risking infection with HIV, a prosecutor who is contemplating bringing charges against someone under section 191.677 needs to know the HIV status of that individual. Likewise, the judges and jurors involved in the litigation of such cases need to know the HIV status of the accused in order to administer justice. The statutory exception for public employees who "need to know" accommodates the disclosure of HIV test results to individuals who are officially involved in the enforcement of section 191.677.1.(2).[7]

We are further convinced that 191.656.1.(1)(b) waives the confidentiality of HIV test results for prosecutors, judges and juries by the language of subsection 4 of section 191.677. Subsection 4 reads:

4. The department of health or local law enforcement agency, victim or others may file a complaint with the prosecuting attorney of a court of competent jurisdiction alleging that an individual has violated a provision of subsection 1 of this section. The department of health shall assist the prosecutor in preparing such case.

This subsection anticipates that the HIV test results of an individual suspected of risking infection may be shared with prose-

<hr>

6. Subsection 2 immunizes good faith disclosures of an individual's HIV status to: the department of health; certain health care personnel working directly with the infected individual; pursuant to the written authorization of the subject of the test results; spouses; the subject of the test results; parents or legal guardians; victims of certain sexual offenses; and employees of a state licensing board acting in furtherance of their disciplinary duties.

7. Sykes argues in a footnote to his brief that even if the exception under section 191.656.1.(1)(b) applied to prosecutors, prosecutors would be

prohibited from disclosing this information to anyone else under section 191.656.2.(3). Subdivision .2.(3) states that "no person to whom the results of an individual's HIV testing has been disclosed ... shall further disclose such results." As explained above, judges and jurors are public officials who would be excepted from the confidentiality statute under subdivision .1.(1)(b). Appellant waived his right to prevent disclosure to members of the general public or witnesses who attended the trial because he failed to request any appropriate protective procedure at trial.

cutors and used in preparation of the state's case against the individual. In enacting this language, the legislature acknowledged that one of the enumerated exceptions to the HIV confidentiality statute must apply to the prosecutors, judges and jurors in appellants' cases. This point is denied.

## IV.

■■■ Sykes makes two additional arguments. The first is that the trial court erred by admitting evidence that Sykes' failed to answer a letter that he received while in jail. Jamie Walker testified that she sent a letter to Sykes while he was in prison in which she asked Sykes how long he had known that he was HIV-positive. Over Sykes' objection, she testified that he had not responded to her letter. Sykes claims that by permitting this testimony, the trial court violated his right not to have his post-arrest silence used against him at trial.

The Fifth Amendment commands that no person shall be compelled in any criminal case to be a witness against himself. *Estelle v. Smith*, 451 U.S. 454, 462, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). The privilege against self-incrimination is safeguarded after arrest by the mandatory warning procedures outlined in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), which include the requirement that police warn those taken into custody that they have the right to remain silent. *United States v. Johnson*, 56 F.3d 947, 955 (8th Cir.1995); *see also State v. Dexter*, 954 S.W.2d 332, 337 (Mo. banc 1997). In *Doyle v. Ohio*, 426 U.S. 610, 618, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the United States Supreme Court held that if a defendant is silent at the time of arrest and after receiving *Miranda* warnings, using that silence to impeach the defendant violates the due process clause of the Fourteenth Amendment. *Dexter*, 954 S.W.2d at 337. "The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony." *Wainwright v. Greenfield*, 474 U.S. 284, 292, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986).

Missouri cases have enforced a defendant's right not to have his post-arrest silence used against him where the defendant is questioned by police officers or other state actors shortly after the defendant is arrested and read his *Miranda* rights. *See, e.g., State v. Dexter*, 954 S.W.2d 332 (1997); *State v. Fuente*, 871 S.W.2d 438 (Mo. banc 1994); *State v. Tims*, 865 S.W.2d 881 (Mo.App.1993); *State v. Bollmann*, 813 S.W.2d 22 (Mo.App. 1991); *State v. Martin*, 797 S.W.2d 758 (Mo. App.1990); *State v. Smart*, 756 S.W.2d 578 (Mo.App.1988); *State v. Richardson*, 724 S.W.2d 311 (Mo.App.1987). The situation in the instant case is markedly different. Here, Sykes' silence occurred in response to questions presented by a private individual. The questions were posed by letter unconnected to any *Miranda* warning. There is no allegation that any officer of the state was actively involved. The only state connection is that Sykes was in custody when he refused to answer Walker's letter.

The rights provided to our citizens by the Constitution protect them from state action. "[T]he principle has become firmly embedded in our constitutional law the principle that the action inhibited by the ... Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful." *Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 92 L.Ed. 1161 (1948); *see also Shapiro v. Columbia Union Nat'l Bank and Trust Co.*, 576 S.W.2d 310, 317–18 (Mo. banc 1979) ("The dichotomy set forth in the Fourteenth Amendment between deprivation by the State ... and private conduct ... against which the Fourteenth Amendment offers no shield goes back as far as the Civil Rights Cases."). We have not addressed whether testimony regarding a defendant's post-arrest silence violates the defendant's Fifth Amendment rights when the silence is in response to a private individual and not a state actor.

Other jurisdictions dealing with this issue have produced mixed results. In *State v. Sanchez*, 130 Ariz. 295, 635 P.2d 1217 (1981), a friend of the defendant who had visited the defendant in jail was called as a witness for

the state. The friend testified that during his visits, he had asked the defendant questions about the crime in which defendant was implicated. The friend testified that the defendant refused to discuss the incident. An Arizona appellate court ruled that this testimony was inadmissible where defendant was both charged and in custody at the time of the questioning. *Id.* at 1220. Conversely, in *Folston v. Allsbrook*, 691 F.2d 184 (4th Cir. 1982), the defendant objected when a fellow inmate testified that the defendant had stood silently by while a codefendant described to fellow prisoners the crime that had been allegedly committed. The fourth circuit court of appeals ruled that such testimony was admissible because:

> *Doyle* [ ] does not create a *per se* rule rendering inadmissible any reference to the post-arrest silence of a criminal defendant. Rather, *Doyle* is expressly limited to the use of silence "at the time of arrest and after receiving Miranda warnings." *Doyle*, 426 U.S. at 619, 96 S.Ct. 2245. In its recent decision in *Fletcher v. Weir*, 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982), the Supreme Court made clear that *Doyle* is inapplicable when the record does not indicate that the defendant "received any *Miranda* warnings during the period in which he remained silent immediately after his arrest." *Fletcher, supra.* Consideration of the rationale underlying *Doyle* makes clear why the holding should be thus limited. As the Court noted in *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975), "silence following the giving of *Miranda* warnings was ordinarily so ambiguous as to have little probative value." Because a defendant's silence may be induced by the assurances contained in the *Miranda* warnings, the government should not be able to use that silence against him. *Id.* at 187.

Here, like in *Folston*, there is little chance that Sykes' silence was in any way related to his *Miranda* warning. Neither does Sykes' silence appear to be related in any way to coercive activity by state officials in connection with his incarceration. *See New York v. Quarles*, 467 U.S. 649, 654, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). Instead, Jamie Walker's letter was the legitimate and understandable

effort of a frightened individual to learn of the circumstances of her potential infection.

Nonetheless, we need not determine if *Doyle* requires exclusion of this evidence because the admission of this evidence could not have been prejudicial to Sykes. The record contains ample evidence, other than his silence in response to Walker's letter, to establish that Sykes knew—all before he engaged in unprotected sexual intercourse with Jamie Walker—that he was HIV positive, that unprotected sexual activity risked the spread of the disease, and that Missouri law prohibited him from deliberately creating a grave and unjustifiable risk of infecting another through sexual contact. If anything, Sykes' silence merely established his callous indifference to Walker's plight.

Sykes' objection raised only the constitutional issue. This point is denied.

### V.

Sykes also claims that the trial court abused its discretion by admitting into evidence state's exhibits 2 and 11. Both of the exhibits contained positive HIV test results for "Sean Sykes" on three different test dates. State's exhibit 2 included forms filled out by hand and state's exhibit 11 consisted of computer printouts. The contested exhibits were admitted under the hearsay exception known as the Uniform Business Records as Evidence Law. Section 490.680, RSMo. This exception provides:

> A record of an act, condition, or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.

The custodian properly established the documents as business records. Sykes' objection goes beneath the documents as business records, however, to the hearsay contained in the documents; that his blood was tested and was found to be HIV-positive. *See State v.*

*Sutherland,* 939 S.W.2d 373, 377 (Mo. banc 1997).

▪ Sykes' argument that the records are not admissible is two-fold. First, he contends that the state did not lay a proper foundation for the test results because the state failed to establish the precise procedures used to test the blood samples and the qualifications and identity of the individual who tested the samples. Second, Sykes argues that the state neither established a proper chain of custody regarding the blood samples that were tested, nor that the samples actually consisted of Sykes' blood.

Daphne Ford was a supervisor at the Kansas City Health Department where Sykes went for HIV testing. Ford testified that she is the official custodian of the forms contained in state's exhibit 2. Ford explained that when someone comes to the office for testing, workers there draw a tube of that person's blood, then fill out the left side of a form with the date and the individual's name. This form contains a sticker on which an identification number has been printed, which the worker peels off and affixes it to the tube of blood. The same number also appears on the form itself. Ford testified that after the tubes of blood are collected and their corresponding forms are filled out, they are sent to the laboratory of the state department of health in Jefferson City for testing. Ford testified that state's exhibit 2 consisted of the forms containing the name "Sean Sykes."

Richard Walkenbach is the senior public health scientist at the state laboratory where Sykes' blood was tested. Walkenbach testified that the tubes containing blood samples and their corresponding forms arrive either by mail or courier. He explained that to ensure that the blood samples do not get mixed up, scientists work in teams to open and log the samples. Under this system, one scientist calls out the number on a particular tube as it is logged in and another scientist verifies that the number matches the number on the requisition form that accompanied the blood sample.

Walkenbach stated that the laboratory's scientists use two tests to check for the presence of HIV antibodies, the ELISA and the Western Blot. He explained the scientific bases of these tests to the jury in detail. Walkenbach also testified that he and three other employees conducted HIV tests at the time Sykes' samples were sent to the laboratory. He gave detailed descriptions of the educational and professional backgrounds of each of these four individuals.

Walkenbach testified that after the tests are read by a computerized spectrophotometer, the scientists enter the test results on to the right side of the forms that are sent with the tubes. The test results are also entered into a computer database, which are then double-checked with the spectrophotometer results. State's exhibit 11 consists of the computer printouts corresponding to Sean Sykes' blood samples. Walkenbach testified that he is the official custodian of the computer data contained in state's exhibit 11.

▪ Opinions of an expert contained in a laboratory report prepared by that expert are admissible without the presence and testimony of the expert. *State v. Taylor,* 486 S.W.2d 239 (Mo.1972). However, it must be shown as part of the report's foundation that the expert would be properly qualified to express an opinion if testifying in person. *State v. Rhone,* 555 S.W.2d 839, 841 (Mo. banc 1977). Sykes alleges that the state failed to establish this foundation because it was unable to show who tested Sykes' blood and the precise procedures that person used.

Here, the state provided testimony as to the credentials of all four of the persons who might have tested the blood. Richard Walkenbach testified that all four met the requirements of the federal Clinical Laboratory Improvement Act: two of the individuals had a bachelor's degree in science, and the other two qualified by virtue of the fact that each had more than twenty years of laboratory experience. An expert must be shown to have "sufficient experience and acquaintance with the phenomena involved." *Rhone,* 555 S.W.2d at 841. Because it would be "impracticable to set any absolute standard as to the qualifications of an expert witness ... the question must rest largely in the sound discretion of the trial court." *Id.* at 841–42. While we agree that it would have been

preferable for the state to have brought forward the specific individual who tested Sykes' blood, we do not find that the trial court abused its discretion in admitting the reports as qualified expert testimony.

■ For the results of tests performed on articles to be admissible, the articles must be in the same condition when tested as when they were originally obtained. *See, e.g., State v. Huff,* 789 S.W.2d 71, 78 (Mo. App.1990); *State v. Dunagan,* 772 S.W.2d 844, 856 (Mo.App.1989). This does not require proof of hand to hand custody of the evidence, nor that the state eliminate all possibility that the evidence has been disturbed. *Huff,* 789 S.W.2d at 78; *State v. Jones,* 760 S.W.2d 536, 538 (Mo.App.1988). "The trial court may assume, absent a showing of bad faith, ill will or proof, that officials having custody of exhibits properly discharged their duties and that no tampering occurred." *Huff,* 789 S.W.2d at 78 (citing *United States v. Mays,* 822 F.2d 793, 796 (8 th Cir.1987); *United States v. Panas,* 738 F.2d 278, 287 (8 th Cir.1984)).

Walkenbach testified in detail as to the steps involved in the testing of blood for HIV: the blood is logged in, tubes are placed in a centrifuge to separate out the blood serum from the blood cells, the blood serum is tested using the ELISA and Western Blot tests, and the results are read by spectrophotometer. Ford and Walkenbach both testified regarding procedures used to ensure that blood samples do not get mixed up and that test results are reported accurately. In addition, the likelihood is low that Sykes' samples were inadvertently replaced by HIV-positive samples on three separate occasions. The trial court, also, did not abuse its discretion to the extent that it determined that the procedures used to test the blood were sufficient and that the laboratory did not inadvertently test the wrong blood.

■ The more troublesome allegation Sykes makes is that the state failed to establish a proper chain of custody showing that the blood that was tested was actually Sykes' blood. Here, without the testimony of the individual(s) who drew blood from Sykes and filled out the forms constituting state's exhibit 2, or any other confirming evidence accompanying the blood, the state has presented no evidence that the blood tested was in fact the blood of Sean Sykes. This failure was held to constitute error in at least one case. *State v. Burnfin,* 771 S.W.2d 908 (Mo.App.1989).

However, certain features of HIV testing, and of this test in particular, differentiate the instant case from cases where evidence was collected from the scene of a crime or where blood samples were taken from a specific subject. Here, there exists no incentive for anyone to deliberately alter or adulterate a blood sample en route to a laboratory for HIV testing or to favor a positive result over a negative result. Sykes' three tests all occurred before he was charged with risking infection with HIV. The purpose of the tests was solely to determine Sykes' HIV status, partially for his own benefit.

Most importantly, however, Sykes' own behavior gives the HIV test results a credibility that they otherwise would not have. Sykes participated in level II counseling on two occasions, something that he would not have done unless his blood was tested and he believed the test results he now contests. Sykes has also made persistent admissions as to his HIV test results. At both of his level II counseling sessions, Sykes signed verification forms attesting to his HIV-positive status. Sykes also admitted that he was HIV-positive to detective Richard Neumann following his arrest.

Hearsay exceptions are ultimately grounded in trustworthiness. *State v. Bell,* 950 S.W.2d 482, 486 (Mo. banc 1997) (Limbaugh, J. concurring). Sufficient indicia of trustworthiness exist here to establish that the blood tests admitted into evidence were tests of Sean Sykes' blood. In this unique situation, we cannot say that the trial court abused its discretion in admitting state's exhibits 2 and 11.[8]

## VI.

The judgments are affirmed.

All concur.

8. This analysis also could be phrased in terms of     lack of prejudice.