STATE of Missouri, Respondent,

v.

Leland BEASLEY, Jr., Appellant.

No. ED 98930.

Missouri Court of Appeals,
Eastern District,
Division Four.

Dec. 24, 2013.

Ellen H. Flottman, Columbia, MO, for appellant.

Chris Koster, Karen L. Kramer, Jefferson City, MO, for respondent.

*Introduction*

GARY M. GAERTNER, JR., Judge.

Leland Beasley, Jr. (Defendant) appeals his convictions following a jury trial of three counts of child molestation in the first degree, four counts of statutory sodomy in the first degree, one count of attempted statutory sodomy in the first degree, one count of attempted statutory sodomy in the second degree, one count of promoting child pornography in the first degree, and three counts of possession of child pornography. We affirm.

*Background*

Defendant does not contest the sufficiency of the evidence supporting his convictions. That evidence was as follows. Defendant was the owner of a gaming retail store called Gamestation Sector 19. He allowed people to play video games in his store for five dollars per hour, often allowing customers to stay after business hours in order to generate more income. Defendant also hosted lock-ins[1] regularly at the store, during which customers could pay twenty dollars to play games all night, from 6 p.m. to 6 a.m. the next morning. Most of Defendant's customers were teens and preteens. When kids attended lock-ins, their parents were not present; the only adults present were employees of the store, including Defendant.

K.N. was born in May of 1996. When K.N. was 12, he visited Gamestation Sector 19 and met Defendant. He lived close enough to walk to the store, and he would go whenever he had money to play video games, about three times per week. K.N. also attended multiple lock-ins. In December of 2008 while K.N. was at the store, he accidentally locked a padlock onto

---

1. "Lock-in" is the term used by Defendant and other witnesses to refer to these overnight events Defendant hosted at Gamestation Sector 19, but it is unclear from the transcript whether the doors were actually locked during any "lock-ins."

a belt loop on the front of his pants. There were other kids and employees in the store at the time. K.N. asked Defendant to cut the padlock off of his pants. Defendant had K.N. sit on a counter at the back of the store, where no one else was present. Defendant put his hand on K.N.'s upper leg and moved his hand up K.N.'s leg over K.N.'s pants. Defendant then touched and rubbed K.N.'s penis over K.N.'s clothing. K.N. was scared and asked Defendant to stop. Defendant tried to put his hand down K.N.'s pants, but one of K.N.'s friends, K.A., called K.N.'s name from the front of the store, and Defendant stopped. Defendant quickly cut the belt loop of K.N.'s pants. K.N. went back to the front of the store to finish his hour of playing time, and then he and K.A. left. K.N. told K.A. what happened, and then K.N. told his mother. K.N. never returned to the store after that.

K.N. later told his school counselor, Amanda VanHorn (VanHorn), about this incident with Defendant. VanHorn made a call to Missouri's child abuse hotline that same day to report the incident. In response, police commenced an investigation of Defendant. Detective Anthony Cavaletti initially responded on January 5, 2009 to the middle school K.N. attended. Detective Cavaletti interviewed K.N. and several other boys who frequented Gamestation Sector 19.

One of these boys was B.N., who was born in June of 1996. He also frequented Gamestation Sector 19, both to play video games during the week and to attend lock-ins. He began going to the store when he was 10 or 11, and he got to know Defendant, who was always there when B.N. was there. B.N. would sometimes go to sleep in a chair during lock-ins. He also frequently stayed after the lock-ins were over in the morning. He would help clean up and then go back to sleep. On one occasion at a lock-in, Defendant laid down on the floor next to B.N. and told B.N. to loosen his belt. B.N. thought that was weird and did not do it. On another occasion, Defendant asked B.N. if he wanted to play a video game, and Defendant said that if he won, B.N. had to share his blanket with Defendant. On another occasion, B.N. saw child pornography that was saved on one of Defendant's computers at the store. B.N. did not remember Defendant ever touching him inappropriately.

B.N. also went on a weekend trip with Defendant and two other boys, B.N.'s younger brother and R.I. R.I. was born in December of 1997. He also regularly visited Gamestation Sector 19 and stayed for lock-ins. They went to Wisconsin Dells and stayed in a hotel. Defendant paid for everything on the trip. R.I. did not remember Defendant ever touching him inappropriately.

After concluding interviews at the middle school, Detective Cavaletti and Sergeant Tony Guinn went to Gamestation Sector 19. Defendant agreed to come with them to the police station to be interviewed. They also asked Defendant if they could seize his laptop, which was at the store, and Defendant consented. At the police station, Detective Cavaletti read Defendant his *Miranda*[2] rights, which Defendant waived. Detective Cavaletti told Defendant there were sexual allegations against him. During their conversation, Defendant denied any inappropriate contact with any boys. At one point the officers mentioned K.N., B.N., and B.N.'s brother. Defendant said he had touched K.N. on his private area by accident, but Defendant had apologized and that was the end of it. Eventually, Defendant told the officers he needed help, and their conver-

---

**2.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

sation ended. The officers arrested Defendant for one charge of child molestation regarding K.N. and held Defendant in jail. Police also continued to investigate Defendant, trying to contact other boys who frequented Gamestation Sector 19.

Through this investigation, police spoke with M.L., who had told his mom about an incident with Defendant at Gamestation Section 19. M.L. was born in June of 1997. When M.L. was 10 years old, he went to Gamestation Sector 19 several times to play video games. He went with an adult initially, but after that he would go by himself. On one occasion, Defendant, who was sitting on a counter at the back of the store, sat M.L. on his lap and started rubbing M.L.'s upper thigh. Then Defendant touched M.L.'s penis over M.L.'s clothing. M.L. jumped off Defendant's lap and left the store. He did not visit the store again.

Part of the ongoing police investigation also included listening to recorded conversations of phone calls Defendant made from jail. The day Defendant was arrested, he called one of his employees, Tim Douglas (Douglas). Defendant asked Douglas to retrieve several items from the store and take them to Defendant's mother's house. Defendant called Douglas an additional two times from jail, and Douglas then took the items to Defendant's mother's house the next day. These items included a green duffle bag, a black bag, a blue bag, a black metal box, and some electronic equipment, including a digital camera and a video camera.

Defendant also called his mother, Leslie Moss (Mother), from jail. He asked her to destroy disks that were in the green duffle bag and to throw away his medication that was in a blue pouch. He also told her to throw away the black box, because it was garbage and it was not his. On January 16, 2009, Sergeant Guinn went to Mother's house to find Defendant's items that Douglas had left there. Mother consented to a search of her residence. When Sergeant Guinn told her what they were looking for, she pointed the items out. The police seized the bags, cameras, and black box. They did not find any medication among these items.

In the meantime on January 12, 2009, Defendant's ex-wife, Mary Helen Day (Day), called Sergeant Guinn. She told him that she had previously obtained a court order to take possession of the vehicle she and Defendant had owned during their marriage, which had been in Defendant's possession since their divorce. She had taken the vehicle without Defendant's knowledge to avoid a confrontation. In it, she found 11 computer disks, marked "virus." She had viewed one of the disks out of curiosity, and she found pictures of adults and young boys having sex. She had immediately turned all of the disks over to police in Illinois. After hearing of Defendant's arrest, Day wanted Sergeant Guinn to know about the disks.

Sergeant Guinn subsequently obtained the disks from the Illinois police. Sergeant Guinn and Detective Cavaletti viewed the disks, and they found multiple images of child pornography. Detective Cavaletti recognized one of the boys pictured, R.B., from the interviews he had conducted at K.N.'s middle school. The picture shows R.B. asleep, with his pants unbuttoned and unzipped and his penis exposed. Forensic analysis of the disks revealed that they contained 3,334 images of child pornography and 159 video files of child pornography. All of these files contained images of boys who appeared to be under the age of 14, engaged in sexual conduct.

In light of all the new evidence discovered since Defendant's initial arrest, Detective Cavaletti decided he would like to

speak to Defendant again on January 19, 2009. Detective Cavaletti retrieved Defendant from the county jail and took him to police headquarters. In an interview room at police headquarters, Detective Cavaletti displayed the camera bag, the black box, the video camera and digital camera taken from Mother's house. He also displayed the 11 disks turned over by Day, as well as pictures of R.B. that Detective Cavaletti had printed from those disks. Then he brought Defendant in to view the items. Detective Cavaletti asked Defendant for consent to search the bags, black box, and cameras, and Defendant agreed. Defendant signed a consent form for the police to search the digital cameras. Defendant then stated that he did not know whether the black box belonged to him. Detective Cavaletti asked Defendant if he had a box like it with a combination lock, and Defendant said yes. Detective Cavaletti asked for the combination of Defendant's box, and Defendant said he did not remember. Eventually Defendant gave written consent for the officers to search the box.

Officers pried open the box. Inside, they found what appeared to be a rubber mold of a child's penis. They also found several computer disks, video tapes, and DVDs, as well as a camera and a memory stick. At the bottom of the box was a bag containing approximately 150 images of child pornography. Several of the disks and videos found in the black box contained child pornography: nearly 30,000 images and 400 videos. The police also searched the digital camera and video camera taken from Mother's house. On it, they found several videos of boys who were sleeping being molested. The face of the person molesting them was not pictured in most of the videos. With the help

of VanHorn, they were able to identify several boys in those videos, many of whom later testified at Defendant's trial.[3]

K.A. was born in May of 1996. He regularly visited Gamestation Sector 19, beginning when he was 12 years old. K.A. would also do work at the store in exchange for time to play video games for free. K.A. attended several lock-ins. He never went to sleep during the lock-ins, but sometimes he would stay after everyone left at 6 a.m. He would help Defendant clean up, and then he would go to sleep. He did not remember anyone ever touching him inappropriately. However, the police later showed him a video of a boy being molested. He recognized himself in the video. The video did not show the face of the person molesting him. K.A. had no independent memory of this taking place.

Among the video evidence police found were also videos of B.N. B.N. recognized himself in two videos showing separate incidents of molestation while B.N. was sleeping. B.N. had no independent memory of the events taking place in the videos, and the videos did not show the face of the person molesting B.N.

Similarly, the police found a video of R.I., which they showed to R.I. He recognized himself in the video. The video showed someone trying to take off R.I.'s belt and unbutton his pants. R.I. woke up and asked if it was morning. A voice replied, and R.I. went back to sleep. R.I. identified the voice as Defendant's. R.I. had no independent recollection of those events happening.

Police also found a video of T.E., who was born in April of 1994. He started visiting Gamestation Sector 19 when he was 14 years old. He went regularly dur-

---

**3.** Two of the boys VanHorn identified, R.B. and T.R., did not testify at trial, but two of the charges against Defendant related to them.

ing the week to play video games, and he also attended several lock-ins. He would go to sleep sometimes during lock-ins. On one of these occasions, T.E. was sleeping on his side. T.E. woke up, because Defendant was rubbing T.E.'s lower back near his buttocks, underneath his clothes. He did not remember Defendant ever trying to put his hand down T.E.'s pants. The video police found showed Defendant trying to put his hand down T.E.'s pants. T.E. woke up and sat up, and Defendant asked, "Are you okay?" T.E. said he was and laid back down.

Before trial, Defendant filed a motion to suppress the statements he had made to police regarding his ownership of the black box they took from Mother's home, which the trial court denied. The jury convicted Defendant of three counts of child molestation in the first degree, four counts of statutory sodomy in the first degree, one count of attempted statutory sodomy in the first degree, one count of attempted statutory sodomy in the second degree, one count of promoting child pornography in the first degree, and three counts of possession of child pornography. The trial court sentenced Defendant to four consecutive life sentences, to be served consecutively with each of four 15–year terms. These terms were all to be served concurrently with the remaining sentences of two four-year terms, two 15–year terms, and one life sentence. Defendant did not file a motion for new trial alleging any error by the trial court. This appeal follows.

### Standard of Review

■■■ Defendant concedes none of his points on appeal were preserved for review, and he requests we exercise our discretion to review them for plain error under Rule 30.20.[4] Plain error is error that is "evident, obvious, and clear." *State*

*v. Smith,* 370 S.W.3d 891, 896 (Mo.App. E.D.2012). In our two-step analysis regarding claims of plain error, we first determine whether such a claim on its face establishes substantial grounds to believe manifest injustice or a miscarriage of justice has occurred. *State v. White,* 247 S.W.3d 557, 561 (Mo.App. E.D.2007). If we find substantial grounds exist, we exercise review "to determine whether manifest injustice or a miscarriage of justice has actually occurred." *Id.*

### Point I

In Defendant's first point, he argues the trial court plainly erred in admitting into evidence statements Defendant made to police regarding his ownership of the black metal box, in which police found evidence of child pornography. Defendant argues allowing these statements violated both his right to counsel and his privilege against self-incrimination, because these statements were obtained during a custodial interrogation without his counsel present. He argues this caused a manifest injustice. We disagree.

■■■ The Fifth Amendment contains a privilege against self-incrimination, which includes a requirement that police warn individuals taken into custody that they have the right to remain silent. *State v. Mahan,* 971 S.W.2d 307, 314 (Mo. banc 1998) (citing *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). The police must give this warning prior to beginning any interrogation. *Mathis v. U.S.,* 391 U.S. 1, 3–4, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968). Interrogation consists of "not only ... express questioning, but also ... any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect."

4. All rule references are to Mo. R.Crim. P.2013, unless otherwise indicated.

*State v. White,* 770 S.W.2d 357, 359 (Mo. App. E.D.1989) (quoting *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)). However, requests for consent to search do not alone constitute interrogation, as consent is not itself an incriminating statement.[5] *White,* 770 S.W.2d at 359–60; *cf. Schneckloth v. Bustamonte,* 412 U.S. 218, 232, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (stating request for consent to search in informal and unstructured conditions is far removed from custodial interrogation requiring warnings as prerequisite; holding there is no constitutional requirement to warn subjects of consent searches that they have the right to refuse consent).

▮▮▮▮ Criminal defendants also have the right to counsel under the Sixth Amendment, which attaches at the time adversary judicial proceedings have been initiated against them.[6] *Kirby v. Illinois,* 406 U.S. 682, 688, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). The Sixth Amendment right, once attached, provides a "distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship." *Patterson v. Illinois,* 487 U.S. 285, 290 n. 3, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988). This right "is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." *Maine v. Moulton,* 474 U.S. 159, 176, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). Sixth Amendment protection does not depend upon a request for counsel by the defendant, but rather "courts indulge in every reasonable presumption against waiver" of this right. *Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).[7]

▮▮▮▮ At the same time, the Sixth Amendment right to counsel is offense specific and applies only to pending charges. *Texas v. Cobb,* 532 U.S. 162, 167, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001) (quoting *McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991)); *State v. Mayes,* 63 S.W.3d 615,

---

5. This is the conclusion reached by several federal appellate courts and appellate courts of Missouri; however, research reveals no opinion from the United States Supreme Court or the Supreme Court of Missouri addressing the question of whether a request for consent to search property of an individual in police custody constitutes interrogation and therefore requires *Miranda* warnings. *See, e.g., U.S. v. Stevens,* 487 F.3d 232, 243 n. 3 (5th Cir.2007) (citing cases; noting Oregon case reaching opposite conclusion that *Miranda* does apply to requests for consent).

6. This right is distinct from the right to counsel under the Fifth Amendment, which is available to an accused during any custodial interrogation under *Miranda,* even before the Sixth Amendment right attaches. *See Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. However, we do not analyze this here as Defendant has not alleged a violation of his Fifth Amendment right to counsel.

7. We note Defendant's argument recites a more restrictive rule from past Missouri appellate decisions, that once an accused has invoked his Sixth Amendment right to counsel, police may not initiate subsequent interrogation for the pending offense without notifying counsel or having counsel present. *See State v. Dixon,* 916 S.W.2d 834, 837 (Mo.App. W.D.1995); *State v. Owens,* 827 S.W.2d 226, 228 (Mo.App. E.D.1991). These cases are based on a prophylactic rule announced by the United States Supreme Court in *Michigan v. Jackson,* 475 U.S. 625, 636, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), that once attached, subsequent waiver of a defendant's Sixth Amendment right to counsel is presumed involuntary. However, *Jackson* has since been overruled. *See Montejo v. Louisiana,* 556 U.S. 778, 792, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009). Further, the *Montejo* Court specifically rejected the *Jackson*-based argument that "no *represented* defendant can ever be approached by the State and asked to consent to interrogation." *Id.* at 789, 129 S.Ct. 2079.

633 (Mo. banc 2001). The Sixth Amendment right does not apply to interrogations concerning uncharged offenses, even those that are factually related, when the charged and uncharged offenses each require proof of a fact the other does not. *Cobb,* 532 U.S. at 168, 173, 121 S.Ct. 1335. In such circumstances, protections against self-incrimination and the right to counsel afforded under the Fifth Amendment, as well as prophylactic rules adopted by the United States Supreme Court to guarantee these rights, sufficiently protect an accused during interrogation for uncharged offenses. *See Montejo v. Louisiana,* 556 U.S. 778, 794–95, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009).

█ Incriminating statements obtained in violation of either a defendant's Fifth Amendment privilege or his Sixth Amendment right are inadmissible. *See Moulton,* 474 U.S. at 180, 106 S.Ct. 477 (Sixth Amendment); *Edwards v. Arizona,* 451 U.S. 477, 487, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (Fifth Amendment).

Here, there was only one charge initially pending against Defendant: child molestation of K.N. By January 19, 2009, Defendant had been arraigned for that initial pending charge, and Defendant testified at a hearing on his motion to suppress that he had been appointed counsel for this initial pending charge a week prior to January 19. Detective Cavaletti testified he assumed Defendant did have counsel, but that he did not know whether this was so before arranging to interview Defendant on January 19. The State does not dispute Defendant's assertion that he had an attorney on January 19. Detective Cavaletti further testified at the motion to suppress hearing that during the January 19 interview at police headquarters, he asked

for Defendant's consent to search the black box. Defendant initially gave oral consent, but before giving written consent, he stated that he did not know whether the box was his. Detective Cavaletti asked whether Defendant had a box like it, and Defendant answered that he did. Detective Cavaletti asked for the combination, and Defendant said he did not remember. Defendant eventually gave written consent to search the black box. After that, Detective Cavaletti told Defendant he would like to interview him again, and Detective Cavaletti gave Defendant his *Miranda* warnings. Defendant stated he did not want to speak with the detectives, and they returned Defendant back to county jail.

Defendant does not argue that the consent he gave to search the box was involuntary, nor does he argue that the evidence found inside the box should have been suppressed.[8] Rather, Defendant argues a miscarriage of justice resulted from the trial court allowing Detective Cavaletti to testify at Defendant's trial about Defendant's statements regarding ownership of the black box that the police had seized from his Mother's house. Defendant argues that because these statements were obtained before the detectives gave him *Miranda* warnings and without Defendant's counsel present, the statements should have been excluded. We find that while the statements regarding ownership were illegally obtained in violation of the Fifth Amendment, their admission at trial under the circumstances here does not constitute manifest injustice requiring reversal.

█ First, because a request for consent to search a container is not itself

---

**8.** Defendant also does not argue that the consent given by Mother to search her residence

was improper.

an interrogation, Detective Cavaletti did not violate the Fifth Amendment when he asked Defendant for consent to search the cameras and the black box. *White,* 770 S.W.2d at 359–60 (request for consent is not interrogation); *see also Cody v. Solem,* 755 F.2d 1323, 1330 (8th Cir.1985) (consent to search is not an incriminating statement), *cited in U.S. v. Beasley,* 688 F.3d 523, 532 (8th Cir.2012) (Defendant's federal appeal; determining consent forms signed by Defendant do not expressly or inferentially acknowledge Defendant's ownership of the equipment). Federal appellate courts addressing this issue have found that while the request for consent without *Miranda* warnings does not violate the Fifth Amendment, whether *Miranda* warnings were given becomes a factor in determining whether the accused's consent to search was voluntarily given under the Fourth Amendment. *See, e.g., U.S. v. Stevens,* 487 F.3d 232, 243 n. 3 (5th Cir.2007) (citing cases). Because Defendant does not dispute the voluntariness of his consent here, we do not consider that question, and we conclude that the request for consent alone did not violate Defendant's Fifth Amendment privilege. Thus, Defendant's initial oral response granting consent to search the box need not be suppressed under the Fifth Amendment.[9]

■ . However, when Defendant additionally answered that he did not know whether the black box was his, Detective Cavaletti's ensuing questions ·constituted interrogation, in that there was a reasonable likelihood Defendant would answer in a way that he would incriminate himself. *Innis,* 446 U.S. at 301, 100 S.Ct. 1682; *see also U.S. v. Cowan,* 674 F.3d 947, 958 (8th Cir.2012) (though initial request for consent was not obtained in violation of *Miranda,* defendant's answer gave officer information that made subsequent questions become interrogation). Thus, failure to give Defendant *Miranda* warnings prior to asking the questions here beyond consent to search violated Defendant's Fifth Amendment privilege, and his subsequent statements should have been suppressed.[10]

At the same time, we do not find a parallel violation of Defendant's Sixth Amendment right to counsel. While Defendant did have appointed counsel at the time of the January 19 interview, that interview was not related to the pending charge of child molestation against K.N.

9. However, we acknowledge the likelihood that, as here, a simple request for consent to search a container rarely, if ever, yields a simple yes or no answer, but can produce incriminating statements regarding ownership of the container. Alternatively, an accused may deny ownership which would then allow police to search the property. *See State v. Toolen,* 945 S.W.2d 629, 632 (Mo.App. E.D. 1997) (person's disclaimer of ownership in property relinquishes expectation of privacy in that property). While *Miranda* warnings are not *per se* required before a request for consent to search, certainly after the initial request for consent of an in-custody accused as herein, *Miranda* warnings should be given. A better practice is to obtain a search warrant and avoid any danger of any constitutional infringement altogether where, as here, there is enough evidence for a search warrant, and the container is already in police custody.

Finally, also under the particular circumstances here, that Defendant told Mother the black box was not his and asked her to throw it away, Defendant had arguably abandoned the box such that no warrant or consent was necessary to search the box. *See State v. Thompson,* 820 S.W.2d 591, 594 (Mo.App. E.D.1991) (citing *State v. Lingar,* 726 S.W.2d 728, 736 (Mo. banc 1987)) (no reasonable expectation of privacy regarding abandoned property, thus no warrant required to search).

10. In so finding, we also note our agreement with the United States District Court in its unpublished decision addressing this very same question involving federal criminal charges against Defendant stemming from the same facts. *See U.S. v. Beasley,* 2011 WL 1315484 at *11 (E.D.Mo.2011).

Rather, Detective Cavaletti testified he wished to speak with Defendant, because the police investigation had produced evidence of other crimes. The contents of the cameras and black box, as well as the 11 disks recovered from Defendant's car, supported different charges against Defendant requiring proof of different elements and facts than those of the initial pending child molestation charge involving K.N.[11] Defendant had not been charged with these other offenses at the time of the January 19 interview, and thus his Sixth Amendment right to counsel had not attached concerning these other offenses. *See Cobb*, 532 U.S. at 173, 121 S.Ct. 1335; *Mayes*, 63 S.W.3d at 633. However, Defendant's statements in response to Detective Cavaletti's questions regarding ownership of the black box should nonetheless have been suppressed under the Fifth Amendment. We find this facially establishes substantial grounds to believe a miscarriage of justice occurred. *See White*, 247 S.W.3d at 561.

■ Despite this, our ultimate determination on appeal under the plain error standard of review is whether the trial court's erroneous admission of these statements actually resulted in manifest injustice or a miscarriage of justice.[12] Under the circumstances here, we conclude no such injustice occurred. While the statements themselves were inadmissible, other evidence of Defendant's guilt was overwhelming. The testimony that the black box came to Defendant's mother's house and was put there by Douglas at Defendant's request, where it was later seized by detectives, was sufficient for the jury to infer Defendant owned or controlled the black box. The videos inside the box were connected to Defendant's camera through forensic evidence, and there was ample testimony and video evidence to establish that Defendant used that camera to make the videos which were in evidence. There was also evidence that many of those videos and pictures were taken at Gamestation Sector 19. Thus, Defendant has not shown that his inadmissible statements to the detectives regarding ownership of the black box resulted in manifest injustice, in light of the overwhelming amount of admissible evidence establishing Defendant's guilt. *See State v. Presberry*, 128 S.W.3d 80, 102–03 (Mo.App. E.D.2003) (quoting *State v. Jordan*, 627 S.W.2d 290, 293 (Mo. banc 1982)) (when guilt established by overwhelming evidence, no manifest injustice despite Fifth Amendment violation). Point denied.

### Point II

Defendant next argues that the trial court plainly erred in allowing the State to introduce evidence consisting of a video of Defendant shaving a boy's legs for the purpose of identifying Defendant as the operator of a camera containing evidence related to the charges against Defendant. Defendant argues any probative value was outweighed by the prejudicial nature of the video, and the trial court's decision to allow it caused manifest injustice or a miscarriage of justice. We disagree.

■ The admission or exclusion of evidence is a matter over which the trial court has broad discretion. *State v. Free-*

---

11. *Compare* Section 566.067, RSMo, (Supp. 2012) (first-degree child molestation) *with* Sections 566.062 (attempted first-degree statutory sodomy), 566.064 (attempted second-degree statutory sodomy), 573.025 (promoting child pornography), 573.037 (possession of child pornography).

12. Defendant represented himself at trial and did not file a motion for new trial. As such, he must endure the consequences of his choice to proceed to trial *pro se* and the resulting lack of preservation of error.

*man*, 269 S.W.3d 422, 426 (Mo. banc 2008). It is well settled that evidence of prior misconduct is inadmissible for the purpose of showing the propensity of the defendant to commit such acts. *State v. Bernard*, 849 S.W.2d 10, 13 (Mo. banc 1993). However, there are exceptions to this rule when the evidence of prior misconduct is offered for some other, legitimate purpose, one of which is to establish the identity of the defendant. *Id.* Furthermore, "[i]n cases involving sexual abuse of children, the recent trend in Missouri has been liberally to allow the admission of evidence of prior sexual misconduct by the defendant." *Id.* Such evidence is admissible when it is logically relevant, in that it tends to prove the defendant is guilty of the charged crimes; and legally relevant, in that the probative value outweighs any prejudicial effect. *Id.*

■ Here, the video in dispute actually shows Defendant in person, shaving a boy's legs. The boy pictured was not a victim of any of the crimes Defendant was charged with in Missouri. The State offered this evidence because in nearly all of the videos offered to prove the counts of child molestation and statutory sodomy, the perpetrator is not pictured. Also, most of the victims in those videos were not able to identify Defendant because they were asleep and had no recollection of the events shown on the videos. However, this disputed video, where Defendant is pictured, was found on the same camera as the other videos supporting the charges against Defendant. Therefore, the State offered it to show that Defendant also made the other videos and possessed the camera on which they were found.

We find no evident, obvious, or clear error in the trial court's exercise of discretion to admit this evidence. First, the act of shaving a boy's legs pictured here, while arguably prejudicial to Defendant, did not constitute evidence of an uncharged criminal offense. Second, the evidence was logically relevant, in that it tended to prove Defendant made the other videos underlying the charged crimes, and that he perpetrated the crimes pictured therein. Finally, though this evidence was arguably prejudicial to Defendant, we do not see any obvious abuse of discretion by the trial court in determining that its probative value outweighed any prejudicial effect. Thus, we see no facial indication that manifest injustice occurred. The trial court did not err, plainly or otherwise, in allowing this evidence. Point denied.

### Point III

Defendant argues that the trial court plainly erred in failing to declare a mistrial *sua sponte* when the prosecutor made statements during closing argument regarding the possibility that some of the boys in the videos, who remained asleep while being molested, had been drugged. Defendant argues these statements were not supported by the evidence and thus the argument was improper. Defendant further argues manifest injustice resulted. We disagree.

During closing argument, the prosecutor made the following statements:

> Was he drugging those boys? I don't know. If you want to look at the video of [T.R.], he doesn't move at all. I mean he looks completely out.... You know, maybe a little Ambien would have knocked some of these boys out, maybe bigger boys don't get knocked out by the same dose, I don't know. But all I know is those boys were molested by this guy, and I know you know that too.

Defendant did not object to this argument.

■ We rarely grant plain error review regarding alleged improper closing argument to which a defendant or counsel

did not object. *State v. Wilson*, 343 S.W.3d 747, 752 (Mo.App. E.D.2011). Plain error requiring reversal arises only when the defendant can show that an improper comment had a decisive effect on the jury's determination and amounts to manifest injustice. *State v. Edwards*, 116 S.W.3d 511, 536–37 (Mo. banc 2003). The State is permitted to argue reasonable inferences from the evidence, and the "trial court maintains broad discretion in the control of closing arguments." *Id.* at 537.

Here, there was evidence that Defendant asked his mother to dispose of medication, A reasonable inference is that the medication Defendant referred to was not necessary for his health, and that it would incriminate him in some way if it were found. Additionally, the videos in evidence of some of the boys showed the boys not stirring while being molested, and the boys further testified they did not have any memory of those events. The jury could infer from this that they had been drugged. At the same time, the prosecutor said more than once that she did not know this to be the case. She did not argue the evidence proved the boys were drugged, nor was such a finding a necessary component to any of the charges against Defendant.

Under these circumstances, we see no error, plain or otherwise, in the trial court's decision not to intervene during the prosecutor's closing argument. Point denied.

### Conclusion

While it was error for the trial court to admit Defendant's statements regarding ownership of the black box, such error did not result in manifest injustice given the overwhelming evidence of Defendant's guilt. The trial court did not err, plainly or otherwise, in admitting video evidence of Defendant shaving a boy's legs for the purpose of establishing Defendant's identity as an operator of the video camera used to create numerous videos containing evidence supporting the charges against Defendant. Finally, there was no error, plain or otherwise, in the trial court's decision to allow the prosecutor's closing argument, as it consisted of reasonable inferences from the evidence. The judgment of the trial court is affirmed.

AFFIRMED.

LISA S. VAN AMBURG, P.J., and PATRICIA L. COHEN, J., concur.