STATE of Missouri, Respondent,

v.

Thomas H. HUFF, Appellant.

No. WD 42200.

Missouri Court of Appeals,
Western District.

March 20, 1990.

Motion for Rehearing and/or
Transfer to Supreme Court Denied
April 24, 1990.

Application to Transfer Denied
June 19, 1990.

Robert A. Horn, James Bandy, Kansas City, for appellant.

William L. Webster, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before KENNEDY, P.J., and LOWENSTEIN and BERREY, JJ.

LOWENSTEIN, Judge.

Following a jury trial, the appellant, Thomas Huff, was convicted of involuntary manslaughter: driving while intoxicated, § 565.024.1(2), RSMo 1986, and assault in the second degree: driving while intoxicated, § 565.060.1(4), RSMo 1986. He was sentenced to five years imprisonment and a $5,000 fine for involuntary manslaughter, and a concurrent one year sentence and $1,000 fine for assault. This appeal challenges: 1) the overruling of Huff's motion for acquittal because of insufficiency of the evidence; 2) the overruling of Huff's motion for acquittal because the state failed its burden of proof; 3) the admittance of certain exhibits into evidence; 4) the failure to give certain jury instructions tendered by Huff; and 5) not allowing defense counsel to cross-examine a state witness via authoritative text.

The evidence favorable to the verdict is as follows: At approximately 1:00 a.m. on April 1, 1988, Patricia Johnston was killed and her sister seriously injured when their vehicle, traveling north on I–435 in Kansas City, struck the rear portion of a tractor-trailer driven by Huff. At the time, Huff's 45–foot flatbed trailer was blocking the two left lanes of northbound I–435, the cab portion of his vehicle being stuck in the grass median.

Johnston had been out drinking with her sister several hours prior to the collision, and her blood alcohol content was .13 percent. A Mr. Thompson, who was traveling behind and to the left of the Johnston vehicle, testified that Johnston made no attempt to slacken speed or take evasive action prior to striking Huff's flatbed.

Two Kansas City police officers, both with training and experience in investigating vehicular homicides, testified for the state. Officers Donovan and Weinberg concluded that Huff made a controlled turn into the median and did not jackknife, as he testified. In other words, Huff became stuck when he attempted a U-turn. The physical evidence supporting this conclusion was 1) the tire tracks in the median were consistent with rolling tires, not skidding tires, 2) Huff's tractor was not damaged, nor was the trailer, as would have been if it had jackknifed, and 3) the vehicle left no skid or scuff marks on the pavement. There was also testimony from Mr. Lees, a tow truck driver who had seen as many as 75 jackknifed trucks, who stated Huff's vehicle did not appear to have jackknifed.

There was testimony that at the time of collision, it had been raining, was foggy and pitch-dark. Three drivers, including Officer Blom, the first officer at the scene, had trouble seeing the flatbed and nearly collided with the trailer. There was also testimony from police witnesses, the tow truck operator, and others that the side of the trailer blocking the two lanes was not illuminated at the time of the accident or immediately thereafter.

An employee of the Regional Crime Laboratory, Mr. Newhouse, examined the side or clearance lights following the collision. He found the bulb and filament of the left-rear clearance light still intact, but concluded the light probably was not operable at the time of collision due to corrosion in and around the bulb. He also found the bulb for the left-center clearance light intact, but again concluded it was probably not in operation at the time of collision. Newhouse testified the filament had received a "cold break," meaning it was broken while the bulb was unlighted. He said it was unlikely the filament had been broken due to the collision or when it was removed from its socket pursuant to examination.

Huff, a professional truck driver, admitted to drinking four or five beers prior to the accident, and an hour and twenty minutes after the accident his blood alcohol content was tested at over .17 percent. He

had driven the truck that day and was returning the unit to a spot north of Kansas City when the accident occurred. At the scene Blom noticed an odor of alcohol on Huff's breath, and Officer Donovan testified that Huff was wobbling and staggering, his speech was slurred, and his eyes were bloodshot.

The case was submitted requiring the jury to believe beyond a reasonable doubt Huff operated the truck while legally drunk and caused the death and injury by blocking two of the three lanes with a flatbed which contained no working side or clearance lights, following his attempt to make an improper U-turn. The headlights of the truck were on, as were the taillights on the trailer which was perpendicular to oncoming traffic.

Huff's evidence was as follows: Huff testified he was headed north on I–435 when another vehicle cut in front of him. He swerved his truck to the left, slid, then ended up in the median. He rolled his vehicle back and forth in an attempt to get out of the median which was wet and muddy. His attempt unsuccessful, he began getting out of his vehicle when the Johnston vehicle struck the trailer.

Witness McDowell testified that after the collision, he had an opportunity to walk around the trailer, and he observed that the rear lights and parking lights were on. Huff vigorously cross-examined several witnesses who had originally said the clearance lights were on and then testified differently. He also contested police expert opinion of his turn into the median being deliberate rather than the result of a jackknife. His expert said there had been a jackknife because of loss of maneuver. Officer Donovan also testified that even if Huff's trailer was not illuminated by lights at the time of the accident, the trailer would have still been visible due to the Johnston vehicle's headlights. He stated normal car headlights illuminate for a distance of 400 to 500 feet, and a car traveling 55 mph can come to a complete stop in about 180 feet. Huff contended Johnston should have been able to see the trailer even if there had been no clearance lights

on the trailer, and should have been able to come to a complete stop, or at least taken evasive action to have avoided a collision.

## I.

Huff first contends error in the trial court's overruling his motion for judgment of acquittal. He reasons the evidence was insufficient to prove the elements of involuntary manslaughter and assault for driving while intoxicated. The state's theory and burden was to prove: 1) Huff was operating the truck; 2) while he was intoxicated; 3) he was "criminally negligent" in a) making an improper U-turn and b) in driving with no clearance lights operating on the side of the flat bed rig; and 4) that the death and injury were a result of his tractor-trailer blocking two lanes of the Interstate Highway.

Huff states the evidence was insufficient to send the case to the jury because: 1) criminal negligence cannot occur when the defendant is not moving, but sitting stuck in the median; 2) Huff was not operating the truck at the time of the collision; 3) he was not making a U-turn; 4) there was evidence the clearance lights were on; and 5) the death and injury were not caused by the acts of Huff, but resulted from the decedent driver's intoxication and failure to keep a lookout. "In examining for sufficiency of the proof, we accept as true all evidence, direct or circumstantial, and all reasonable inferences supportive of the verdict and disregard those portions of the record contrary to a finding of guilt.... Our function is not to weigh the evidence, but rather to determine whether there was sufficient proof from which the jury could reasonably have found defendant guilty as charged." *State v. Turner*, 623 S.W.2d 4, 6 (Mo. banc 1981).

■ Both the involuntary manslaughter and assault statutes applicable to this prosecution are class C felonies when committed by an intoxicated driver who operates a motor vehicle with criminal negligence causing the death of any person. *State v. Lewis*, 735 S.W.2d 183 (Mo.App.1987). "Criminal negligence," as used in the vehicular manslaughter context of

§ 565.024.1(2), *supra,* is proved by the conduct of the intoxicated driver which results in a loss of life, and specifically "the failure of the actor to be aware that the conduct involves substantial or unjustifiable risk of the result which follows." *State v. Kliegel,* 674 S.W.2d 64, 68 (Mo.App.1984). The state here submitted the intoxicated Huff, in getting stuck while making a U-turn with no lights on the side of the flatbed, involved conduct which "amounted to a gross deviation from the standard of care which a person would exercise in the situation." *Kliegel, supra,* at 67.

■ 1) Huff presents no authority for his first proposition of the vehicular manslaughter statute being applicable only to the conduct involving moving cars, and not applicable to a stationary vehicle. This point is ruled against him. There is nothing in § 565.024.1(2) which requires the intoxicated driver to actually be moving at the time of the criminal negligence, *i.e.,* running a stop light or speeding.

■ 2) There is no merit in the next point which is since Huff's tractor was stuck in the median and had to be towed, he was not "operating" a vehicle. A state's witness testified to getting in the cab to lend assistance to Huff who was behind the wheel just before the crash. Huff admitted that just prior to the crash he had tried to "rock" the truck to get it to move forward. His testimony was he was getting out of the tractor at the time of impact. This point is rejected out of hand. In *State v. O'Toole,* 673 S.W.2d 25 (Mo. banc 1984), the defendant fell asleep behind the wheel of his vehicle which was stopped partially blocking a roadway engaged in "park", with the engine and lights burning. The Supreme Court rejected the argument that he was not "operating" the vehicle as it pertained to a driving while intoxicated state charge. The court held "operating" also included "being in actual physical control of a motor vehicle," and occurs "even though the machine stands motionless ..." *Id.* at 27.

■ 3) Huff's explanation of his tractor unit being in the median and the flatbed across the highway as a result of his being cut off by another motorist was obviously not believed by the jury. Huff said his truck jackknifed and got stuck in the median. His presentation was buttressed by the fact he could have gone several miles north and then reversed course by using an exit and then an entrance ramp back to I–435.

The transcript is replete with there being no evidence of a jackknife, but the tractor having "driven through that point of the center median rather than sliding into that center median." Steven Weinberg, an eight year veteran on accident investigations for the Kansas City Police who investigated the scene, saw the rig's tire tracks in the turf portion of the median. He noted the front wheels were actually on the inside edge of the southbound pavement when the rear tractor wheels got stuck. The ruts caused by the rear wheels were as a result of the spinning attempt to move the unit. Weinberg further discounted a skid and resulting jackknife by reason of there being no damage to the tractor unit. He said in a jackknife, the trailer unit will come into contact with certain portions of "the pulling unit and do noticeable damage to that tractor unit, if not the trailer unit."

Another police witness, Terry Donovan, and the tow driver who moved the rig that night gave similar opinions, that is the truck had not jackknifed. Donovan, who spent thirteen years in traffic investigation, noticed Huff wobbling and smelled alcohol on Huff's breath. He made the arrest for driving under the influence. He then administered the test which showed Huff to be intoxicated. Photographs taken at the scene of both the tracks in the median and the position of Huff's truck show the vehicle was deliberately driven into the median and was starting to head the other way on the opposite side when it became stuck.

4) Similarly, there was sufficient evidence for the jury to find the lights on the side of the flatbed trailer were not on the night of the accident. One of the investigating policeman, the tow truck driver and another person at the scene testified these side lights were not on. Officer Jeffrey Blom stated he "didn't observe any lights

on the trailer," and when he drove up he "almost hit the back end of the trailer because I didn't see it, because it had been raining and was foggy." With the rain and late hour, and without the clearance lights, the trailer, at windshield height for oncoming traffic, sat stretched across two lanes. Even without the expert testimony of test results as to whether these lights were operable, as discussed *infra*, would not change the outcome on this issue. If the jury believed the three witnesses who said the lights were not on, and disbelieved the defendant's contrary testimony, this was sufficient to support the conviction. *State v. Chunn*, 701 S.W.2d 578, 584 (Mo.App. 1985).

Huff points out the state admitted the taillights of the trailer were on, and of there being no statutory requirement the clearance lights be on and working. He concludes it cannot then be criminal negligence to not have such lights. However, it was permissible for the jury to conclude that under these circumstances, the failure to have side illumination constituted an element of criminal negligence.

\* \* \* \* \* \*

The evidence favorable to the convictions shows Huff, who was intoxicated, gave rise to a substantial and unjustifiable risk of death by attempting to make an illegal U-turn and allowing his unlighted flatbed to block two lanes of traffic on a rainy, dark evening, and his failure to be aware of the risk amounted to a gross deviation from the standard of care a reasonable person would exercise in the situation. *State v. Kliegel, supra*, at 68–69.

## II.

Huff's most compelling point is he should have been granted an acquittal because the death of Johnston and the injury to Edgar were caused by Johnston's negligent acts which amounted to an intervening or supervening cause.

It is undisputed Johnston took to the road legally drunk. She weaved and her driving was erratic when entering I–435 shortly before the crash. Even without the clearance lights on the rig, her headlights should have reflected the obstacle in time to have slowed, stopped or switched one lane to her right and miss the trailer. A driver in the far left lane saw the reflection from Johnston's headlights and cut across the lanes to miss a collision. That driver did, however, only narrowly miss the trailer, as did another driver who came from the same direction. Johnston never slowed and ran directly into Huff's rig. In support of this point, Huff relies on several civil cases involving the negligence and contributory fault of an injured plaintiff.

The concept of contributory negligence does not apply as a defense to vehicular manslaughter. *State v. Medlin*, 355 Mo. 564, 197 S.W.2d 626, 630 (1946); *State v. Adams*, 359 Mo. 845, 224 S.W.2d 54, 59 (1949). A wrongdoer does not escape the consequences for a criminal act just because another event concurs to produce the prohibited consequence. *State v. Kliegel, supra*, at 66. Contentions of the contributory negligence of the victim or others cannot exculpate from liability and want of proximate cause.

In *State v. Kusch*, 712 S.W.2d 457, 459 (Mo.App.1986), the defendant driver had a blood alcohol content of .10 while that of the other driver was .12. This court, relying on *Kliegel*, rejected Kusch's argument that the intoxication of the other driver "may have been a contributing cause if not the sole cause of the accident." *Id.* at 459. The opinion went on to say, "any fault attributable to Valverde [the other driver] does not exculpate the defendant from his offense." *Id.* at 460. *Kliegel* and *Kusch* seem to totally exclude traditional concepts of contributory negligence in a vehicular manslaughter case. By excluding the conduct of others or particularly the victim, there can be no defense that the victim was drunk and inattentive in hitting the Huff trailer. Similarly, Johnston's actions would not, as proposed, have "amounted to an intervening cause which was a new and independent force which interrupted the chain of events initiated by Thomas Huff's negligence and become the

responsible direct proximate cause of her death and her sister's injuries."

In this case the defendant was intoxicated and he attempted an illegal U-turn which left his unlighted flatbed spanning two lanes of traffic on a rainy night. These facts made a submissible case for a jury decision as to the cause of the death and injury. Despite the strict language of *Kliegel* and *Kusch* as to totally ignoring victim negligence, a defendant is "legally accountable" if "the direct or immediate cause of death resulted naturally or proximately from his own unlawful act." *State v. Williams*, 652 S.W.2d 102, 111 (Mo. banc 1983). *See also State v. Holt*, 592 S.W.2d 759, 765 (Mo. banc 1980).

Suffice it to say there can be such acts of the victim or another that could amount to an intervening cause in a prosecution under either §§ 565.024 and 565.060. Under these facts, it cannot be said that as a matter of law the conduct of Johnston rose to such a level so as to have exculpated Huff's intoxication and acts of criminal negligence. It would seem as if there is a two-step process necessary to make the final determination of criminal liability of causation of death or injury under the above acts: 1) is there a driver who was intoxicated and who committed such acts in the operation of a vehicle to create an unjustifiable risk of a certain result that constituted a gross deviation from what a reasonable person would do in the situation, and 2) whether the acts or conduct of the victim or other, while perhaps negligent under traditional tort concepts, arose to the level to be the "sole" or "efficient intervening" cause of death or injury.

The following cases shed light on the level of victim negligence required to constitute a new or sole cause of their injury. In *State v. Yudichak*, 561 A.2d 407 (Vt. 1989), the intoxicated driver of a fire truck claimed to have been forced off the road by the negligence of another driver. The court upheld the conviction for the firefighters' deaths, and refused the defense of an efficient intervening cause saying, "the natural result of unlawful driving may include failure to adequately respond to traffic conditions," and, where the "defendant's unlawful act is established in the claim of direct legal causation he is criminally responsible for the course of events which naturally follow from that act, unless the act of another 'break[s] the chain of causation of the original negligent actor.' " *Id.* at 409. In *State v. Nester*, 336 S.E.2d 187, 189 (W.Va.1985), the court rejected the appellant's contention the victim's failure to wear a seatbelt constituted an intervening cause, *i.e.*, a new and independent force, which broke the causal connection between the original act or omission and became the "direct and immediate cause" of the injury. In *City of Cleveland v. Pellech*, 8 Ohio Misc.2d 37, 457 N.E.2d 961 (Ohio Mun.1983), both the driver and the pedestrian decedent had been drinking, and the pedestrian was jaywalking. The court said contributory negligence is not a defense unless it is the sole proximate cause of the accident. *Id.* 457 N.E.2d at 963. Also, in *Sims v. State*, 466 N.E.2d 24, 25 (Ind.1984), the court stated the general rule in criminal law that an accused is not responsible for a death unless the variation between the result "hazarded and the result achieved is not so extraordinary that it would be unfair to hold the defendant responsible for the actual result." The court in *People v. Dunhill*, 40 Colo.App. 137, 570 P.2d 1097 (1977), faced a case where the intoxicated driver was driving with one headlight and killed a pedestrian. The court rejected the argument of the victim's contributory negligence being the proximate cause of her death. The court said 570 P.2d at page 1098: "[A]bsent proof that it was an independent intervening cause the contributory negligence is not a defense in a prosecution for vehicular homicide." In *Commonwealth v. Heck*, 341 Pa.Super. 183, 491 A.2d 212, 227 (1985), the court said the contributory negligence of the victim would not keep the defendant driver from being criminally liable, "even if the victim's negligence contributing to the accident is greater than the defendant's.... The rule is that the contributory negligence of the victim is not a defense to a criminal charge of homicide

by vehicle if the defendant's actions were a substantial factor in causing the death."

On the basis of the facts here, and viewed in light of the statutory and case law, the court cannot say it was error to overrule the motions for acquittal and submit this case to the jury, nor can the court now say the verdict was not supported by sufficient evidence. The point is denied.

### III.

Huff's third point contends trial court error in admitting into evidence exhibits 47 and 48, the left-rear and left-center clearance lights removed from his trailer, and exhibits 40 and 41, photographs of these lights immediately prior to their removal. Huff asserts these lights were not shown to be in substantially the same condition as they were at the time of the accident.

The admission of demonstrative evidence is within the sound discretion of the trial court. *State v. Dudley*, 724 S.W.2d 517, 522 (Mo.App.1986); *State v. Murray*, 630 S.W.2d 577, 581 (Mo. banc 1982). The trial court is in the best position to determine whether there has been improper tampering with an exhibit. *Dudley, supra; Murray, supra.* In order to receive testimony showing the results of tests performed on articles, the articles must be in the same condition when tested as when originally obtained. *State v. Dunagan*, 772 S.W.2d 844, 856 (Mo.App.1989). The evidence must provide reasonable assurance that the exhibit offered is the same and in like condition as when received, *Id., State v. Jones*, 760 S.W.2d 536, 538 (Mo. App.1988); *State v. Fels*, 741 S.W.2d 855, 857 (Mo.App.1987); *State v. Price*, 731 S.W.2d 287, 290 (Mo.App.1987), and reasonable assurance that the exhibit offered has not been tampered with or contaminated. *Dunagan, supra; Price, supra.* However, this reasonable assurance standard does not require proof of hand to hand custody nor the exclusion of every possibility that the evidence had been disturbed. *Jones, supra; Fels, supra.* The trial court may also assume, absent a showing of bad faith, ill will or proof, that officials having custody of exhibits properly discharged their

duties and that no tampering occurred. *United States v. Mays*, 822 F.2d 793, 796 (8th Cir.1987); *United States v. Panas*, 738 F.2d 278, 287 (8th Cir.1984).

In the instant case, the collision occurred at 1:00 a.m., the tractor-trailer was towed to the city lot, and at noon that same day, eleven hours later, Mr. Beverlin photographed and removed the lights. Huff contends the condition of the lights could have changed during this eleven hour period—1) by turning the lights on after the accident, the filament could be broken, 2) since the lens cap on exhibit 47 was knocked off by the collision, it was open to corrosion from rain, battery acid and radiator fluid, and 3) the filament may have been broken during towing. Although possible the lights were turned on and off after the collision, Mr. Newhouse testified there would be a discoloration of the filament if this occurred. It can be inferred from his testimony no such discoloration occurred. As to the later two contentions, they are merely possibilities having no basis in the record.

The evidence gives "reasonable assurance" that the lights remained in the same condition between the time of the accident and the time of removal. The state is not forced into the position of excluding every possibility the evidence had been disturbed, *Jones, supra; Fels, supra*, and what possibilities Huff propounds are refuted. Moreover, there was substantial eyewitness testimony that the lights were not on immediately prior to and after the collision. Given the broad discretion vested in the trial court, *Dudley, supra; Murray, supra*, it cannot be said error was committed. Point three is denied.

### IV.

Huff's points IV, V and VII challenge the trial court's failure to submit to the jury tendered instructions A, excusable accident, B and C, emergency measure, and D, prior consistent statements. Review is based on whether prejudice has been shown. *Frederick v. Witthaus*, 736 S.W.2d 520, 521 (Mo.App.1987).

Huff's tendered instruction A on excusable accident is based on § 563.070, RSMo (1986) which reads:

1. Conduct which would otherwise constitute a crime under chapter 565, RSMo, is excusable and not criminal when it is the result of accident in any lawful act by lawful means without knowingly causing or attempting to cause physical injury *and without acting with criminal negligence.* [Emphasis added]

He was charged and convicted of involuntary manslaughter, § 565.024.1(2), and second degree assault, § 565.060.1(4), both of which require a finding of criminal negligence.

■ Under this instance, no need exists for a separate instruction on accident because a finding of the elements of §§ 565.024.1(2) and 565.060.1(4), *i.e.*, criminal negligence, is inconsistent with the defense of excusable accident. *State v. Mallett*, 732 S.W.2d 527, 536 (Mo. banc 1987). Thus, any instruction on accident would have been redundant. *Id.; State v. Miller*, 772 S.W.2d 782, 785 (Mo.App.1989); *State v. Bates*, 751 S.W.2d 758, 759 (Mo. banc 1988). Moreover, Huff was entitled to and did offer evidence which he contended showed his vehicle went out of control when he attempted to avoid an auto which cut in front of him. If he was criminally negligent as the jury must have found, the jury, of necessity, had to reject his version of the events. Therefore, an additional instruction would have been useless to his defense. *Miller, supra, Bates, supra.*

■ Huff's tendered instructions B and C on emergency measure is based on § 563.026, RSMo 1986 which reads in part:

... conduct *which would otherwise constitute any crime* other than a class A felony or murder is justifiable and not criminal when it is necessary as an emergency measure to avoid an imminent public or private injury ... occasioned or developed through no fault of the actor.... [Emphasis added]

Huff asserts that in taking his testimony as true, as the court must, *State v. Thomas*, 625 S.W.2d 115, 122 (Mo.1981), an emergency measure instruction should have been given. However, an instruction is to be given only "when the claimed facts and circumstances, if true, are legally sufficient to support the instruction." *State v. Owen*, 748 S.W.2d 893, 895 (Mo.App.1988). The facts as recited by Huff do not warrant the submission of an emergency measure instruction.

Huff claims he was driving on I–435 when another vehicle swerved in front of him. In order to avoid a collision, Huff turned his tractor-trailer, thereby losing control and sliding into the median. If taken as true, *Thomas, supra*, this testimony is basically at odds with an emergency measure defense. The basis of such a defense is conduct "which would otherwise constitute [a] crime." Swerving to avoid another vehicle is not a crime, it is more akin to excusable accident which has been discussed *supra*. This testimony does not speak to criminal activity and therefore is not sufficient to support the tendered instruction. *Owen, supra.*

■ Huff's final contention concerning instructional error is that his tendered instruction D on prior consistent statements should have been given to the jury. This instruction was based on MAI–Cr2d 3.54, however, no comparable instruction is contained in MAI–Cr3rd. A court's failure to utilize an instruction which has been abolished is not error. *State v. Clay*, 779 S.W.2d 673, 677 (Mo.App.1989).

V.

Huff's final point on appeal claims error in not allowing defense counsel to cross-examine Officer Donovan with an authoritative text. Defense counsel read the following passage from the Northwestern University Traffic Accident Investigation Manual and asked the officer if he agreed:

At the beginning of the investigation, even though very much upset, the driver may give more accurate facts than later on. His memory will be fresh and he will have had little time to rationalize or make up a story. Also, before he has had time to gather his wits, he may give useful information that he ordinarily

would not give. This is often true of drivers under the influence of alcohol....

The state's objection to this question on the basis of improper cross-examination was sustained.

A trial court is allowed broad discretion in controlling cross-examination since it is in the best position to asess the tenor of cross-examination through firsthand exposure to the witnesses and the manner and form of questioning. *State v. Leisure,* 749 S.W.2d 366, 378 (Mo. banc 1988); *State v. Osterloh,* 773 S.W.2d 213, 217 (Mo.App. 1989). This discretion includes objections to relevancy and materiality. *State v. Simpson,* 611 S.W.2d 556, 650 (Mo.App. 1981).

■■■ The reason Officer Donovan was cross-examined as to Huff's statement after the accident was to challenge the officer's testimony that Huff's speech was slurred. Cross-examination was not on the content of the conversation nor its believability, but only on its clarity. Therefore, using a quote from a text concerned solely with the believability of Huff's statement was outside the scope of cross-examination. *State v. Taylor,* 745 S.W.2d 173, 175 (Mo. App.1987); *State v. Ross,* 680 S.W.2d 213, 219 (Mo.App.1984); *State v. Cutts,* 600 S.W.2d 75, 76 (Mo.App.1980). The fact officer Donovan gave his opinion that Huff was at fault and the tractor-trailer did not jackknife did not change the tenor of the state's examination. The officer did not testify that Huff was lying, only that the evidence showed the truck did not jackknife but was consciously driven into the median. In fact, Officer Donovan testified he had come to the conclusion it was Huff's fault even before he spoke to him. Whether Huff's statement was believable had no impact on the officers initial finding of fault. Cross-examination was properly limited, the trial court did not abuse its discretion. *Leisure, supra; Osterloh, supra.*

The judgment is affirmed.