**STATE of Missouri, Plaintiff–
Respondent,**

v.

**Duncan T. SMITH, Respondent–
Appellant.**

**No. 21907.**

Missouri Court of Appeals,
Southern District,
Division Two.

Nov. 5, 1998.

Bob Tyler, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Catherine Chatman, Asst. Atty. Gen., Jefferson City, for respondent.

SHRUM, Presiding Judge.

A jury convicted Duncan T. Smith (Defendant), an attorney, of possession of a controlled substance, § 195.202 RSMo,[1] a class C felony. It also convicted Defendant of the misdemeanor offenses of driving while intoxicated, possession of drug paraphernalia, and failure to drive on the right half of the roadway. After the trial court entered its judgment and sentence on each conviction, Defendant appealed. We affirm.

On appeal, Defendant presents two points relied on. His first point charges that the trial court

"plainly erred in failing to declare a mistrial *sua sponte* after permitting the State to repeatedly ask [Defendant] to disclose the name of a client and to comment upon [Defendant's] refusal to disclose the name of the client during closing argument, failing to rule on the attorney-client privilege invoked by [Defendant] and in refusing [Defendant's] proposed jury instructions on the duty of confidentiality owed a client by an attorney...."

For his second point relied on, Defendant asserts that the trial court "plainly erred" in overruling his objection to the admission of cocaine samples into evidence because of the State's alleged failure to establish a proper chain of custody therefor.

By requesting plain error review, Defendant recognizes that he failed to preserve his claims of trial court error because he never filed a motion for new trial. *See* Rule 29.11(d).[2]

■ Discretionary plain error review is authorized by Rule 30.20.[3] To obtain relief under Rule 30.20, a defendant must show that "the action of the trial court was not only erroneous, but that the error so substantially impacted upon his rights that manifest injustice or a miscarriage of justice will result if the error is left uncorrected." *State v. Hornbuckle*, 769 S.W.2d 89, 92–93 (Mo. banc 1989). The determination of whether plain error exists must be based on a consideration of the facts and circumstances of each case. *State v. Cline*, 808 S.W.2d 822, 824[5] (Mo.banc 1991). "A defendant bears the burden of demonstrating manifest injustice or miscarriage of justice." *State v. Varvera*, 897 S.W.2d 198, 201[9] (Mo.App.1995).

The following facts are essential to an understanding of Defendant's first point relied on. A Charleston police officer stopped Defendant for driving on the wrong side of the road. Before Defendant stopped his car, he handed a bag to his passenger and told her to put it under the seat or on the floor. The passenger put the object under the front seat. Later, when officers searched the car, they discovered a blue Crown Royal bag under the right front seat. The bag contained drug paraphernalia.

---

1. All statutory references are to RSMo 1994 unless otherwise indicated.

2. All rule references are to Missouri Court Rules (1998) unless otherwise indicated.
 In pertinent part, Rule 29.11(d) provides:
 "In jury-tried cases allegations of error to be preserved for appellate review must be included in a motion for new trial except that questions of jurisdiction of the court over the offenses charged, questions as to whether the indictment or information states an offense and questions authorized by Rule 27.07 to be presented by motion for judgment of acquittal need not be included in a motion for new trial."
 Here, Defendant's allegations of error were among those that had to be included in a motion for new trial.

3. In pertinent part, Rule 30.20 states: "[P]lain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom."

After the stop, Defendant told officers he was a lawyer. When the officers searched Defendant, they found an envelope in his coat pocket. The envelope, which was addressed to Defendant, contained a white substance the officers believed was cocaine. Later tests confirmed their suspicions.

At trial, Defendant explained the envelope and its contents as follows. As an attorney, he represented "a lot of alleged drug dealers." He testified that drug dealers "usually pay in cash" and "[i]n general ... where they keep their cash is where they keep their stash." Defendant told the jury that "to the extent that the money and drugs are together, residue of the drugs can and will get on the money." Accordingly, it was Defendant's theory that "because I did collect money from someone that day who was alleged to be a drug dealer, that there was residue on the money and I had stuck the money in that envelope." Defendant also testified: "It is my theory that the residue fell off of the money, and that's how it was in the envelope."

The prosecutor objected when Defendant, using a box and simulated cocaine, asked to demonstrate to the jury how cocaine might have been transferred from the alleged drug dealer's stash to Defendant's envelope via the cash. The prosecutor's objection prompted the judge to hold a conference outside the jury's presence during which the prosecutor was allowed to voir dire Defendant. She asked Defendant to name the client who had paid him with money "you guessed had cocaine on it." Defendant refused, invoking the attorney-client privilege. Defendant did not, however, explain anything about his relationship with the alleged client or why he received money from him. Defendant made the following offer of proof regarding his proposed demonstration:

"[Defendant]: Your Honor, on January 18th, on that day I was collecting money. And I was collecting money from one particular client who is alleged to be a dope dealer, and in fact, probably is since he had something that looked like drugs in his possession. He also stored his money in the place with something that looked like drugs."

"At the time that I went to collect my money, I went in with him. He—He pulled the money out of his stash where he had the—where he had the items that looked like drugs. That's where he gave it to me from. I took it and I stuck it in the envelope, and I stuck it in my pocket. I later went by my office because I was planning on going out to Missouri that night. I took the money out of my pocket and stuck the envelope with the letter in it back in my pocket, and I left."

After hearing Defendant's offer of proof, the trial court denied his request to perform the demonstration for the jury. As the conference ended, the prosecutor asked the trial court to instruct Defendant that he must identify the client who may have paid him with dirty money or withdraw such defense. The trial court answered: "Well, we'll cross ... it when we get to it."

Defendant then resumed testifying, telling the jury that the envelope was his, the letter inside was his, but he knew nothing about anything else in the envelope. During cross-examination, Defendant repeated his theory that any cocaine in the envelope must have come from money given him by a drug dealer. When asked to identify his client, Defendant first answered, "I can't tell you." Continuing, Defendant told the jury: "I have an ethical violation. I cannot tell you." However, once again Defendant proffered no evidence or explanation of the nature or scope of his relationship with the alleged client.

Next, Defendant read to the jury (without objection) a paraphrased version of Rule 4–1.6, "Rules of Professional Conduct." He also read § 491.060(3) to the jury. After Defendant finished reading, the parties again argued about the applicability of the attorney-client privilege to this situation. The trial judge cut short the argument when he stated to the prosecutor, "Do you have another line of questioning? We'll come back to this in a minute." The prosecutor heeded the judge's suggestion and proceeded with a different line of questioning.

Later, the prosecutor again raised the issue of the identity of the client Defendant theorized had paid him with "dirty" money. As before, Defendant refused to disclose the

name of his alleged client. However, he voiced no objection to the prosecutor's renewed questioning. Consequently, the trial court never ruled on Defendant's claim of attorney-client privilege.

During the instruction conference, Defendant tendered four instructions. Defendant's proposed instructions contained the materials he had already read to the jury, i.e., the paraphrased Rule 4–1.6, "Rules of Professional Conduct," and § 491.060(3). The trial judge refused Defendant's proffered instructions, noting that they were not MAI instructions and that Defendant had already read the materials to the jury.

During closing arguments, the prosecutor referred several times to Defendant's refusal to identify his client. Specifically, she argued that "being an attorney doesn't give you any special privileges under the law," that Defendant could not blame a client for the presence of cocaine in the envelope and then refuse to disclose the client's name, and that there was "nothing about being an attorney ... that prevent[ed]" Defendant from disclosing the name of the client. Defendant did not object to the prosecutor's arguments.

■ Appellate courts " 'rarely grant relief on assertions of plain error as to closing argument ... because, in the absence of objection and request for relief, the trial court's options are narrowed to uninvited interference with summation and a corresponding increase of error by such intervention.' " *State v. Bogard*, 836 S.W.2d 87, 89 (Mo.App.1992) (quoting *State v. Clemmons*, 753 S.W.2d 901, 907–08 (Mo.banc 1988)).

■ Trial strategy looms as an important consideration in any trial; accordingly, assertions of plain error concerning matters contained in closing argument are "generally denied without explication." *State v. Wood*, 719 S.W.2d 756, 759[5] (Mo.banc 1986). In *State v. McMillin*, 783 S.W.2d 82 (Mo.banc 1990), our supreme court refused to review the defendant's claims of error regarding closing argument under the plain error stan-

dard saying, " 'The plain error rule should be used sparingly and does not justify a review of every trial error that has not been properly preserved for appellate review.' " 783 S.W.2d at 97–98. (Citations omitted.) We, too, have refused to review unpreserved claims of trial court error regarding closing argument for plain error. *See, e.g., Bogard*, 836 S.W.2d at 89; *State v. Jordan*, 834 S.W.2d 900, 901 (Mo.App.1992).

■ Adhering to the foregoing, we expressly refuse to review Defendant's claims regarding closing argument for plain error. Perhaps Defendant believed the prosecutor's remarks were inconsequential and did not warrant objection, or, perhaps, as a matter of trial strategy, Defendant sought to "set the stage" for an appeal of "built[-]in error." *Wood*, 719 S.W.2d at 760. Whatever the reason for Defendant's failure to object, we decline to exercise our discretion to review for plain error that part of Defendant's first point that assigns error to the trial court's acts or omissions during the prosecutor's closing argument.

■ Turning to the remainder of Defendant's first point, we find no plain error in the trial court's refusal to declare a mistrial *sua sponte* because of the prosecutor's questioning Defendant about his client's name, the trial court's refusal to rule on Defendant's objections to such questioning, or the trial court's refusal to give the instructions proffered by Defendant. The statute on which Defendant relies, § 491.060(3), is declaratory of the common law rule on attorney-client privilege.[4] *State ex rel. Great Am. Ins. Co. v. Smith*, 574 S.W.2d 379, 386[8] (Mo.banc 1978).

" 'Our statute [on attorney-client privilege] ... provides that an attorney shall be incompetent to testify concerning any communication made to him by his client *in that relation, or his advise thereon*, without the consent of such client.

It is thus to be observed that for the rule of privilege to apply, the relation of

---

4. Section 491.060(3) provides:
"The following persons shall be incompetent to testify:
....

(3) An attorney, concerning any communication made to him by his client in that relation, or his advice thereon, without the consent of such client."

attorney and client must have actually existed between the parties at the time the communication was made or the advice given. Moreover, such relation must have existed as to the subject matter of the communication or advice; and the communication, if it is to be privileged, must have been made to the attorney in his professional capacity, and on account of the relation of attorney and client.' " (Emphasis supplied.)

*Id.* (quoting *Bussen v. Del Commune,* 239 Mo.App. 859, 199 S.W.2d 13, 20–21 (1947)). *See Pipes v. Sevier,* 694 S.W.2d 918, 925–26[12–13] (Mo.App.1985).

■■ Whether the attorney-client privilege protects a particular communication, including a client's identity, must be determined on a case-to-case basis. *Chamberlin v. Missouri Elections Comm'n,* 540 S.W.2d 876, 881 (Mo.banc 1976). In all instances, however, in order for the privilege to apply, one must show (1) the existence of an attorney-client relationship at the time of the interaction or communication, and (2) that such relationship existed with regard to the subject matter of the communication or incident. *See Smith,* 574 S.W.2d at 379, 386[8]; *Bussen,* 199 S.W.2d at 21[10].

■ Defendant made no such showing here. Although Defendant testified that he had received supposed "dirty" money from a client "who is alleged to be a drug dealer," he offered no details regarding his purported professional relationship with the client. For example, there is no evidence regarding when the alleged attorney-client relationship commenced or whether it existed at the time Defendant received the money. Furthermore, there is no way to determine whether the relationship between Defendant and his "client" was even professional in nature (as opposed to criminal or fraudulent). We can only speculate as to why Defendant collected the money. Did Defendant receive the money as a professional fee? Did Defendant collect the money as part of a lawful business deal wholly unrelated to his professional representation of the client? Did he receive the currency as part of a money laundering scheme? Did the money represent Defendant's share of illicit drug sales? Did the money constitute payment for Defendant's assistance of the client in criminal or fraudulent conduct?

■ The law is clear that even though the "privileged communication may be a shield of defense as to crimes already committed, it cannot be used as a sword or weapon of offense to enable persons to carry out contemplated crimes against society." *Burger v. Crocker,* 392 S.W.2d 640, 645 (Mo. App.1965). *See* Comment to Rule 4–1.6. Likewise, a party may not claim the privilege where the dealing and communication between a non-lawyer and a lawyer concern non-legal matters. *See In re Huffman's Estate,* 132 Mo.App. 44, 111 S.W. 848, 855 (Mo. App.1908). Without evidence as to why the money came into Defendant's possession and the nature of the relationship between Defendant and his alleged client, the trial court had no basis for deciding whether Rule 4–1.6 or § 491.060(3) precluded Defendant from disclosing his alleged client's identity. Under these circumstances, we find no manifest injustice or miscarriage of justice in either the trial court's actions or inactions with regard to the issues involving Defendant's claims of attorney-client privilege or the trial court's refusal to submit to the jury the instructions requested by Defendant.

We also note that traces of cocaine were in the paraphernalia found in the Crown Royal bag. There was direct evidence that Defendant handed the bag and its contents to his passenger as they were being stopped. This evidence alone overwhelmingly demonstrated Defendant's guilt on the drug possession charge. Under the circumstances, Defendant has wholly failed to show that the court's actions or inactions regarding his assertions of attorney-client privilege had a decisive effect on his conviction in light of the evidence presented. *See State v. Parker,* 856 S.W.2d 331, 333[4] (Mo.banc 1993).

For the foregoing reasons, Defendant's first point is without merit and is denied.

■ In his second point, Defendant contends that the trial court plainly erred in admitting into evidence, over Defendant's objection, two of the State's exhibits—the blue Crown Royal bag containing drug parapher-

nalia and the envelope seized from Defendant. Defendant argues that the State failed to establish a proper chain of custody for these two items and that the State's evidence did not provide a "reasonable assurance" that the two exhibits were in substantially the same condition when analyzed as they were when seized. Defendant asserts that the State's chain of custody was faulty because the State did not offer the testimony of the person at the Southeast Missouri crime laboratory who received the two exhibits from a Charleston police officer for testing. Thus, the State failed to present any evidence regarding what happened with or to the exhibits between the time they were received at the crime laboratory and the time they were obtained and analyzed by Dr. Robert Briner, who conducts analyses of evidence at the crime laboratory and who did testify at trial. Continuing, Defendant insists that "[w]e are left to speculate as to what happened" with or to the exhibits during this period of time for which the exhibits were unaccounted. Consequently, he argues that there was a fatal break in the chain of custody. We disagree.

The determination as to whether a chain of custody has been sufficiently established to allow the admission of physical evidence is within the trial court's discretion. *State v. Sullivan,* 935 S.W.2d 747, 754[7] (Mo.App.1996). The State need not establish hand-to-hand custody of the evidence, show that the evidence was continually watched from the time it was seized until trial, or adduce evidence tending to exclude every possibility that the evidence was disturbed. *State v. Rosendahl,* 938 S.W.2d 274, 278[10] (Mo.App.1997). Rather, it is sufficient that the evidence provide a "reasonable assurance" that the articles offered are in the same and in like condition as when received, and that the items have not been tampered with or contaminated. *State v. Huff,* 789 S.W.2d 71, 78[9] (Mo.App.1990); *State v. Dunagan,* 772 S.W.2d 844, 856[6–7] (Mo.App. 1989). The trial court is in the best position to evaluate whether an exhibit has been improperly tampered with or contaminated. *Huff,* 789 S.W.2d at 78; *State v. Dudley,* 724 S.W.2d 517, 522[14] (Mo.App.1986).

Here, Officer Robert Hearnes, Jr., delivered evidence seized from Defendant to the Southeast Missouri crime laboratory at Cape Girardeau. Dr. Briner testified as follows. The subject items were "brought into the laboratory and [were] signed in by Mrs. Johnson, who is my chief criminalist on the 25th of [January, 1996]." Mrs. Johnson placed a lab number on the envelopes containing the items received. Based on laboratory procedures, Mrs. Johnson would not have taken the evidence from Officer Hearnes if it had not been contained in sealed envelopes. Mrs. Johnson did not directly hand the exhibits in question to Dr. Briner. The laboratory procedure was to place evidence received in "the locker corresponding to that week of the month.... [T]hen it's locked in there and then when I go back—and when I go in to analyze it, or whoever happens to pick that week to analyze it, they go in and pull it out...." Dr. Briner identified the two exhibits at issue as the items he analyzed at the laboratory and in which he found cocaine.

At trial, Officer Hearnes identified the Crown Royal bag and its contents as the evidence seized from Defendant's car. He also testified that the bag and its contents "appeared" the same at trial as they did on the evening they were seized. Additionally, Officer Hearnes identified the envelope as being that which Officer Anthony Moody seized from Defendant. When asked if there was anything different about the envelope at trial from when it was seized, Hearnes answered: "Other than what has been processed at the crime lab, it's still in the same condition...." Officer Moody also identified the envelope at trial as being that which he had seized from Defendant and testified that, other than the quantity of material contained therein, it looked no different.

The testimony of Dr. Briner and Officers Hearnes and Moody offers a reasonable assurance that the two exhibits at issue were in a like condition when tested as when received and that they had not been tampered with or contaminated. We are confirmed in that view by the absence of evidence indicating bad faith or ill will on the part of the persons responsible for handling and testing this evi-

dence. "The court may assume, in the absence of evidence to the contrary, that the officials charged with custody of the evidence properly discharged their duties and did not tamper with the evidence." *State v. Taylor,* 804 S.W.2d 59, 61 (Mo.App.1991) (citing *Huff,* 789 S.W.2d at 78).

 Finally, we note that even if a proper chain of custody was not established, the exhibits were properly admitted because the chain of custody of physical evidence is irrelevant where, as here, the exhibits were positively identified. *State v. Malone,* 694 S.W.2d 723, 727[3] (Mo.banc 1985); *Sullivan,* 935 S.W.2d at 754. Any possible weaknesses in the identifications were properly the subject of cross-examination and were for the jury to consider in assessing the weight of the evidence. *Malone,* 694 S.W.2d at 727[3]. Point II is denied.

The judgment is affirmed.

MONTGOMERY and BARNEY, JJ., concur.