**STATE of Missouri, Respondent,**

v.

**Joseph A. MOORE, Appellant.**

**No. ED 82178.**

Missouri Court of Appeals,
Eastern District,
Division Five.

Dec. 16, 2003.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 11, 2004.

Application for Transfer Denied
March 30, 2004.

James M. Martin, St. Louis, MO, for appellant.

John M. Morris III, Karen L. Kramer, Jefferson City, MO, for respondent.

GEORGE W. DRAPER II, Judge.

Joseph Moore (hereinafter, "Defendant") appeals from the judgment entered after a jury convicted him of one count involuntary manslaughter, Section 565.024.1.(2) RSMo (2000),[1] and two counts of second degree assault, Section 565.060 RSMo (2000), in connection with a chain reaction automobile collision. Defendant brings three points of error on appeal. First, Defendant claims there was insufficient evidence to support the involuntary manslaughter and second degree assault convictions. Second, Defendant argues there were sufficient intervening causes to relieve him of criminal liability. Finally, Defendant claims the trial court erred in admitting the results of his blood tests taken after the accident. We affirm.

The evidence viewed in the light most favorable to the verdict reveals this case derives from a multiple car accident on December 23, 1999. All drivers were traveling in the southbound lanes of Interstate 55. The first driver, Frank Wilson (hereinafter, "Wilson"), was driving along Interstate 55 after consuming at least nine or ten beers. Wilson passed out behind the wheel, causing a single car accident on the left side of the highway. Wilson's gray car did not have its lights on after it came to a stop, and it was facing the wrong way.

Thereafter, two additional cars impacted Wilson's car. The first car was operated by Christi Coleman (hereinafter, "Coleman"). Coleman testified she was traveling in the far left lane when she saw Wilson's car as she came around a slight turn. Coleman attempted to avoid Wilson's car, but was unable to do so because there was a car in the right lane that she could not pass. Coleman swerved, but still collided with Wilson's car. After her car came to a stop in front of Wilson's car, Coleman exited her vehicle and called her boyfriend from her cell phone.

The third car involved in the collision was driven by Dawn Price (hereinafter, "Price"). Price saw two cars in the left lane with their lights off. Price jerked the wheel and tried to avoid the cars, but she felt her car hit one of the stopped cars. Price pulled to the right side of the highway.

---

1. All statutory references are to RSMo (2000) unless otherwise noted.

Robert and Katherine Krause were driving southbound on Interstate 55 when they came upon the accident scene. Mr. Krause drove around the damaged vehicles and pulled onto the left-hand shoulder in front of Coleman's car. Mrs. Krause called the police from her cell phone while Mr. Krause searched for safety equipment to alert the oncoming traffic of the accident.

Mrs. Krause noticed Coleman and walked toward her. They engaged in conversation near Coleman's car. Mr. Krause walked toward Wilson's car to see if he could turn on the lights to signal the other drivers. Mr. Krause felt exposed after opening up Wilson's car door; so he stepped back and shut the door. As he closed the door, he noticed headlights from an approaching vehicle.

Artimese Russell (hereinafter, "Russell") was a passenger in a Ford Expedition traveling in the far left-hand lane on southbound Interstate 55. Russell saw a "little car" following them. This vehicle was later determined to be driven by Defendant. Russell commented Defendant "was like speeding" and that he "came from behind and swooped over in front of us." Russell estimated the Expedition was traveling approximately 50–55 miles per hour at this point, but she could not estimate how fast Defendant's car was traveling, only stating "it just was going really fast."

As the Expedition approached the accident scene, it began to slow down. Russell testified Defendant could not see around the Expedition to safely pass. Russell says at this point Defendant was going "a little bit faster" than the Expedition. Defendant then passed the Expedition, and Russell stated Defendant had no time to swerve or hit his brakes. Defendant's car impacted one of the cars stalled in the left-hand lane. As a result, Mr. Krause was struck by Wilson's car and suffered serious injuries. Wilson's car impacted Coleman's car, which struck Coleman and Mrs. Krause. Coleman was seriously injured, and Mrs. Krause was killed.

Officer Ronald Gilmore (hereinafter, "Officer Gilmore") arrived on the scene to investigate the accident. Officer Gilmore has been a police officer for fourteen years and has investigated 125 accidents. Officer Gilmore testified he was trained in accident reconstruction.

Officer Gilmore observed the position of each vehicle involved in the accident and measured each vehicles's location and distance from where Defendant's vehicle came to rest with Wilson's car, the initial point of impact. Based on his observations, experience, and investigation Officer Gilmore estimated Defendant was traveling at least 70 miles per hour at the time of impact. Officer Gilmore based this estimate on the skid marks from the actual impact of the accident to where Defendant's car came to rest. Officer Gilmore opined any object sitting on the highway should have been visible to Defendant as he rounded the curve into the straight away.

Defendant was transported to an area hospital where he was treated for his injuries. An officer arriving at the hospital to interview Defendant observed he had bloodshot, watery eyes, and he smelled of intoxicants. Two blood samples were drawn from Defendant. The first sample was ordered by the treating physician at 8:36 p.m. Defendant's blood alcohol content registered at .203 percent. A second sample ordered by the police at 9:22 p.m. measured Defendant's blood alcohol content at .178 percent.

After a jury trial, Defendant was convicted of one count of involuntary manslaughter and two counts of second degree assault. Defendant was sentenced to

three years imprisonment on the involuntary manslaughter conviction, and one year imprisonment on each assault count, the terms to run consecutively. Defendant appeals.

Defendant brings three points on appeal. We address Defendant's third point first for sake of clarity. Defendant's third point on appeal claims the trial court erred in admitting the results of his blood tests taken after the accident. Defendant claims the first blood test was obtained without a warrant, and therefore, he had a reasonable expectation of privacy in its results. Further, Defendant claims neither blood test was administered pursuant to Section 577.029 RSMo (2000), and as such, the results were unreliable and should have been excluded at trial.

Trial courts retain broad discretion over issues of relevancy and admissibility of evidence, and we will not interfere with those decisions unless there is a clear showing of abuse of discretion. *State v. Uka*, 25 S.W.3d 624, 627 (Mo.App. E.D. 2000). A trial court will be found to have abused its discretion when its ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *State v. Rutter*, 93 S.W.3d 714, 729 (Mo. banc 2002). Additionally, we review for prejudice and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial. *State v. Richardson*, 923 S.W.2d 301, 311 (Mo. banc 1996).

■ The first blood sample was ordered by an emergency room physician. This sample was drawn and tested at approximately 8:36 p.m. Defendant's blood alcohol content registered at .203 percent. Defendant claims he had a reasonable expectation of privacy with respect to the results of the test because the blood was drawn for medical purposes and not pursuant to the implied consent law. We disagree.

Section 577.037.1 states that "upon the trial of any criminal action . . ., arising out of acts alleged to have been committed by any person while driving a motor vehicle while in an intoxicated condition . . ." the blood alcohol content is admissible, and Section 491.060(5), which discusses the patient-physician privilege, shall not prevent the admissibility of such evidence. This statute explicitly allows for the admission of this evidence. Moreover, Defendant signed an authorization to release this information to the police. The trial court did not abuse its discretion in admitting the first test result.

■ A second blood sample was ordered by the police after informing Defendant of the implied consent law at 9:22 p.m. This second sample measured Defendant's blood alcohol content at .178 percent. Defendant contests the chain of custody and whether the sample was refrigerated properly prior to testing.

Regardless of whether the record indicates precisely that the sample was refrigerated at all times, the test results provide guidance as to this issue. The chromatogram of the blood did not indicate any decomposition or bacteria in the sample, which would be present had the sample not been refrigerated properly. Therefore, the jury could draw a reasonable inference that the lack of any indication of decomposition or bacteria means the sample was refrigerated properly. We cannot say the trial court abused its discretion in admitting the second blood sample. Defendant's third point is denied.

■ Defendant's first point on appeal claims there was insufficient evidence to support the conviction for involuntary manslaughter and second degree assault. Defendant claims there was no evidence

presented that he was driving erratically or was operating his vehicle at an excessive speed. Alternatively, Defendant argues that even if there is evidence to support these contentions, erratic driving and excessive speed do not rise to the level of criminal negligence to support a conviction for involuntary manslaughter.

In considering whether the evidence is sufficient to support the jury's verdict, we must look to the elements of the crime and consider each in turn to determine whether a reasonable juror could find each of the elements beyond a reasonable doubt. *State v. Grim*, 854 S.W.2d 403, 405 (Mo. banc 1993)(*citing State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989)). Therefore, under the *Dulany* standard, we are required to take the evidence in the light most favorable to the State and grant the State all reasonable inferences from the evidence, disregarding all contrary inferences. *Dulany*, 781 S.W.2d at 55.

Pursuant to Section 565.024.1(2), a person commits the crime of involuntary manslaughter in the first degree if he [or she] "[w]hile in an intoxicated condition operates a motor vehicle in this state and, when so operating, acts with criminal negligence to cause the death of any person." Similarly, a person operating a motor vehicle while in an intoxicated condition who acts with criminal negligence so as to cause physical injury is guilty of assault in the second degree. Section 565.060.1(4); *State v. Meanor*, 863 S.W.2d 884, 886 (Mo. banc 1993). Criminal negligence is defined in Section 562.016 as the failure "to be aware of a substantial and unjustifiable risk that circumstances exist or a result will follow, and such failure constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." "While intoxication alone does not support a conviction of manslaughter or second degree assault, it is a factor which the trier of fact can consider, in connection with other evidence, in determining whether criminal negligence exists." *State v. Reichert*, 854 S.W.2d 584, 603 (Mo.App. S.D.1993).

In *State v. Kliegel*, 674 S.W.2d 64 (Mo. App. W.D.1984), the defendant was convicted of vehicular manslaughter. The court held the defendant's intoxication, excessive speeding, and running a red light rose to the level of criminal negligence sufficient to sustain the conviction. *Id.* at 69. Similarly, in *State v. Kusch*, 712 S.W.2d 457 (Mo.App. W.D.1986), the court held evidence of the defendant driving onto the wrong side of the road while intoxicated and, thus, causing the deaths of two people was sufficient to establish a manslaughter conviction. *Id.* at 460. The court in *State v. Huff*, 789 S.W.2d 71 (Mo. App. W.D.1990) found sufficient evidence to convict the defendant of involuntary manslaughter who was operating a tractor-trailer while in an intoxicated condition and attempting to make an illegal U-turn, which resulted in his tractor falling over and blocking two lanes of traffic. *Id.* at 78. Finally, in *Reichert*, there was sufficient evidence to convict the defendant of involuntary manslaughter when she was intoxicated, failed to swerve, did not slow down to avoid the accident, and appeared to accelerate until the point of impact with the victim's car. *Reichert*, 854 S.W.2d at 604.

There was ample evidence in this record to support the finding Defendant was intoxicated at the time of the accident as addressed in Defendant's third point. Moreover, the record supports a finding Defendant was traveling at an excessive speed and driving erratically at the time of the accident.

Officer Gilmore estimated Defendant was traveling at least 70 miles per hour at the time of impact. This estimate was

based on his observations, experience, and investigation of the accident scene. Additionally, Russell testified Defendant "was like speeding" and that he "came from behind and swooped over in front of us." Russell could not estimate how fast Defendant was traveling, but stated "it just was going really fast."

There was also ample evidence in the record that Defendant was driving erratically. Russell testified Defendant was following the Expedition very closely, so much so she commented that she wished he would go around them. Russell also testified Defendant "swooped over" in front of them prior to the accident. Moreover, Russell stated Defendant's car was smaller than the Expedition and that he could not see around it to safely pass into another lane. We also note that other drivers saw the accident prior to arriving at the scene and were able to avoid the wreckage.

Based on the foregoing, we hold there was sufficient evidence in the record to find Defendant failed to be aware of a substantial and unjustifiable risk that circumstances existed or a result will follow, and as such, was criminally negligent in killing Mrs. Krause and injuring Coleman and Mr. Krause. Defendant's first point is denied.

■ Defendant's second point argues there were sufficient intervening causes to relieve him of criminal liability. Defendant claims several intervening causes occurred prior to his involvement in the accident. Defendant points out Wilson's initial negligent action of driving while intoxicated, in addition to the fault of the other drivers who subsequently struck the Wilson vehicle, all occurring prior to him com-

ing to the scene. These causes, coupled with the victims's decision to "expos[e] themselves to serious threat of injury" by standing near the wreckage, were sufficient intervening forces which, in Defendant's opinion, should relieve him of criminal liability.

Defendant's argument has been advanced unsuccessfully in previous cases. In *Kliegel*, the defendant argued the victim created the risk of his death by driving in an intoxicated state and speeding prior to the accident. This rationale was rejected by the Western District, who likened this argument to a contributory negligence defense. The court held contributory negligence was not a viable defense to a vehicular manslaughter charge. *Kliegel*, 674 S.W.2d at 66. Moreover, the court stated, "[n]or does a wrongdoer escape liability for a criminal act because another event concurs to produce the prohibited consequence." *Id.*

A similar holding was established in *Kusch* where the defendant argued the victim's higher blood alcohol content may have been a contributing cause, if not the sole cause, of the accident. Relying on *Kliegel*, the court held there was sufficient evidence upon which to convict the defendant for causing the accident given "any fault attributable to [the victim] does not exculpate the defendant from his offense." *Kusch*, 712 S.W.2d at 460.[2]

Finally, in *Reichert*, the defendant claimed the trial court erred in excluding evidence of the victim's alleged intoxication at the time of the accident, which defendant argues would have been sufficient to establish an intervening cause to the acci-

---

2. The *Huff* court proffered a different analysis to take into account the actions of the victim in determining causation. Despite applying a two-step analysis, the court ultimately reached the same conclusion on those facts that there was sufficient evidence presented that the victim was not contributorily negligent. *Id.* at 78.

dent, relieving her of criminal liability. The Southern District relied on the holdings in *Kliegel, Kusch,* and *Huff* to hold the facts of the particular case did not rise to the level of "a new and independent force which would have become the sole cause of this accident, thereby exonerating defendant." *Reichert,* 854 S.W.2d at 599.

Similarly, we find the victims's actions in this case do not rise to the level of a new and independent force which would become the sole cause of the accident. As stated above, we found sufficient evidence in the record that Defendant was intoxicated, speeding, and driving erratically at the time of the accident. Moreover, other drivers, who were not intoxicated or driving at an excessive speed, avoided the accident. Prior to Defendant entering the accident scene, there was no evidence in the record of anyone suffering any injuries as a result of the Wilson car's accident. All of the injuries and loss of life occurred due to Defendant's actions. Here, none of the victims's actions can be said to be the "sole cause" of the accident. Defendant's second point is denied.

The judgment of the trial court is affirmed.

SHERRI B. SULLIVAN, C.J., and ROBERT G. DOWD, JR., J., concur.